716

MYERS MOTORS, Inc. v. KAISER–FRAZER
SALES CORPORATION.

Civil Action No. 907.

United States District Court
D. Minnesota, Fifth Division.

April 14, 1949.

See also, D.C., 80 F.Supp. 18.

James G. Nye, Elvero J. McMillan, and George W. Atmore, all of Duluth, Minn. (Gillette, Nye, Montague, Sullivan & Atmore, of Duluth, Minn., of counsel), for plaintiff.

Pierce Butler, Irving Clark, and John Hannaford, all of St. Paul, Minn. (Doherty, Rumble, Butler & Mitchell, of St. Paul, Minn., of counsel), for defendant.

DONOVAN, District Judge.

Myers Motors, Inc., hereinafter referred to as plaintiff, brought suit against Kaiser-Frazer Sales Corporation, hereinafter referred to as defendant, to recover damages for breach of contract. The complaint sets up three causes of action.

The first cause of action is based on a contract alleged to have been entered into by the parties on or about April 10, 1946, wherein and whereby plaintiff agreed to purchase for cash, f. o. b. Willow Run, Michigan, and defendant agreed to sell to plaintiff, 400 Kaiser automobiles; that defendant delivered but 18 of said Kaiser automobiles, following which it refused to deliver the remaining 382. For this breach plaintiff claims to have been damaged in the sum of $171,900.

For a second cause of action plaintiff alleges that on or about April 10, 1946, the parties entered into a contract wherein and whereby plaintiff agreed to purchase for cash, f. o. b. Willow Run, Michigan, and defendant agreed to sell to plaintiff, 1500 Frazer automobiles; that following delivery of 68 Frazer automobiles defendant refused to deliver the remaining 1432 Frazer automobiles, and plaintiff claims to have been damaged thereby in the sum of $303,925.

For a third cause of action plaintiff alleges that on or about May 15, 1947, plaintiff and defendant entered into a contract wherein and whereby plaintiff agreed to purchase for cash, f. o. b. Willow Run, Michigan, and defendant agreed to sell to plaintiff, 100 Frazer Model F–47C Manhatten automobiles, and in accordance therewith defendant delivered 5 of said Manhatten automobiles and thereafter refused to deliver the balance, and for which breach plaintiff alleges it has been damaged in the sum of $28,125.

Defendant answered, admitting that it is the proper party defendant in each of said causes of action, and further, that if the contracts pleaded and relied upon by plaintiff did exist that said contracts were "subject to a certain other contract (herein-

after termed 'franchise' * * *) * * [and] that under said franchise contract the defendant had the right, without any liability in damages or otherwise to plaintiff, to terminate said franchise contract and any other agreements * * * including the contract alleged to exist in * * * the Complaint, * * * and did so terminate said contract or contracts * * * by notice given on or about March 5, 1947."

The instant case is now before the court on motions for summary judgment by both parties.

The facts were stipulated. Plaintiff is a Minnesota corporation. Defendant is a Michigan corporation. The matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000. The agreements relied upon by plaintiff are claimed to have been made with Graham-Paige Motors Corporation, hereinafter referred to as Graham, an affiliate of Kaiser-Frazer Corporation, hereinafter referred to as Kaiser-Frazer. Defendant is a wholly-owned subsidiary of Kaiser-Frazer, and has succeeded to all rights and liabilities of Graham and Kaiser-Frazer for the purposes of this lawsuit.

On or about December 31, 1945, Graham and plaintiff executed and delivered an instrument entitled "Distributors Franchise Automobiles." On or about February 25, 1946, Kaiser-Frazer and plaintiff executed and delivered an instrument described as "Direct Dealers Franchise Automobiles."

Pertinent to the motions herein made are paragraphs 9, 13, 14 and 15 of Distributors Franchise:

"Appointment of Dealers. Nine. Distributor shall procure, appoint and maintain at such points in his sales area as Graham shall from time to time designate dealers acceptable to Graham. All dealers which Distributor shall thus appoint shall enter into Dealer Franchises with Distributor and Graham on forms which Graham shall furnish."

"Development of Sales Area. Thirteen. Distributor shall develop, to the satisfaction of Graham, the sales area allotted to him hereunder. If, in the sole opinion and discretion of Graham, Distributor shall not so develop his sales area or shall not comply with any of the other requirements hereof, Graham may terminate this Agreement upon ninety (90) days notice to Distributor.

"Termination. Fourteen. Distributor may, with or without cause, terminate this Agreement upon sixty (60) days notice to Graham. The death, receivership, bankruptcy, suspension of business or dissolution of Distributor shall be considered a termination hereof without further action by Graham. Neither party shall be liable to the other for damages of any kind or character whatsoever on account of any termination of this Agreement provided for in this or the preceding paragraph.

"Optional Repurchase by Graham. Fifteen. Within fifteen (15) days after any termination hereof, Graham shall have the option to purchase and receive, and Distributor hereby agrees to sell and deliver in the event that such option is exercised, at Distributor's place of business and at Distributor's net delivered purchase price, all new and unused current models of Graham motor vehicles which, in the opinion of Graham, are in good condition and which Distributor shall have purchased from Graham hereunder."

Subsequent to the execution of said franchises, Graham and Kaiser-Frazer wrote to plaintiff, suggesting that the time was opportune for plaintiff to enter its order covering the anticipated requirements of plaintiff's retail operations, as well as all of plaintiff's dealers', and enclosed order blanks for that purpose. Certain correspondence was had between the parties relative thereto, following which plaintiff placed orders with defendant for 400 Kaiser cars, 1500 Frazer cars, and 100 Manhattens. Partial delivery was made by defendant as above indicated.

On March 5, 1947, following partial delivery of the cars ordered, defendant notified plaintiff of the termination of the franchises or agreements referred to, and further advised plaintiff that "no further shipments of automobiles will be made." The reason given plaintiff for such termination was that:

"\* \* \* you have failed to provide satisfactory facilities in keeping with the value of the franchise you hold, all of which reflects itself in the over-all job of proper development of your sales area. You have failed to maintain a place of business including salesroom, service station, parts department and used car facilities satisfactory to our company as required by Paragraph 10 of the Distributor's Franchise and by Paragraph 9 of the Direct Dealers Franchise. Therefore, in our opinion, you have failed to develop your sales area and to comply with certain of the requirements of said agreement."

The stipulation of facts includes copies of the franchises, bulletins issued from time to time by defendant, information relative to the type, prices, construction and appearance of the automobiles, and general information that might be expected to be furnished by the manufacturer to the distributor and dealer of said cars.

The pleadings and facts present the following issues:

(a) Did plaintiff and defendant (or defendant's predecessors, to whose liability defendant admittedly has succeeded) enter into a contract for the purchase by the plaintiff and sale by the defendant (or predecessors) of 400 Kaisers? 1500 Frazers? or 100 Manhattans? or any one or more automobiles? If so, was such contract performed?

(b) If plaintiff and defendant entered into any one or more contracts for specified numbers of cars, were those contracts subject to termination, and terminated, without liability on the part of the defendant (or its predecessors) under provisions of the franchise instruments between plaintiff and defendant (or defendant's predecessors, rights of which admittedly accrued to defendant)?

Plaintiff contends:

(1) That the solicitation by defendant of plaintiff's firm orders for automobiles and the furnishing of order blanks for that purpose by defendant amounted to offers to sell which were accepted by plaintiff;

(2) If the solicitations of the defendant are not construed as offers to sell, plaintiff's orders were offers to buy, which were accepted by defendant's delivery of a part of each order, the acceptance of delivery under each order, and the payment therefor by plaintiff;

(3) The franchises have no contractual status, are purely illusory, and in any event contain no provision whereby their cancellation purports to cancel the automobile sales contracts.

Defendant contends:

(1) That the franchises constitute the only contract between the parties;

(2) That there were no contracts for sale and purchase of specified numbers of cars;

(3) If there were such contracts, they were subject to cancellation, and cancelled under the terms of the franchise agreements.

Plaintiff predicates its right to recover on the existence and validity of the three contracts pleaded in the complaint, and on the claim that the franchises are not contracts at all. In the absence of the franchises I would have no difficulty in concluding that plaintiff should recover. Hence, the all-important matter for determination herein is whether the franchises are valid contracts, and, if valid, what effect they have on the so-called "automobile sales or firm order contracts" that followed.

By oral argument and briefs, displaying scholarly research and professional skill, able counsel for plaintiff vigorously challenge the validity of the so-called master contracts, saying:

"The franchises are of no significance, \* \* \* they are not contracts at all. \* \* \* Plaintiff's firm order contracts are unconditional and make no reference whatsoever to the franchises. How then can the lifeless and illusory franchises modify the subsequent transactions of the parties which did have the dignity of contractual status? The so-called franchises imposed no obligation on plaintiff to buy or defendant to sell any specified number of automobiles. They also were terminable at will. \* \* \* As the citations in the briefs of both parties make clear, the dealer or distributor has in practically all

instances been denied relief when suing for a breach of these franchises."

Plaintiff quotes from Huffman v. Paige-Detroit Motor Car Co., 8 Cir., 262 F. 116, at page 118, as follows:

"It is quite manifest that the contract merely furnished a basis for future dealings to be observed no longer than was mutually satisfactory. There was no hard and fast commitment of either party, if he chose to break away."

The court, deciding for defendant, discusses a provision similar to paragraph thirteen of the franchise herein, saying:

"But aside from the provisions above noted, indicating a lack of mutuality of obligation, the contract expressly reserved to defendant the right of cancellation when in its opinion the plaintiff was not working the territory to the best advantage. By another clause it was provided that, if the defendant 'believes that the dealer [the plaintiff] is not properly and diligently pushing the sale of its cars, it hereby reserves the right at its election, and without making itself liable in any manner for any claim or action for damages, * * * to cancel and terminate this agreement. * * *'"

That the franchise is one-sided, illusory and unfair, is emphasized time and again by the courts, and invariably reference is made to the distributor's and dealer's right to reject the franchise at the outset and before damage is sustained by them. In E. I. DuPont DeNemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 227, 89 A.L.R. 238, the court was confronted with a contract in some respects similar to those relied on by defendant in the case at bar. Judge John B. Sanborn reviewed the authorities, and among other things said:

"The important question in this case is whether the termination of this contract by the DuPont Company gave to the Reno Company a cause of action for damages.

*    *    *    *    *    *

"There is much to be said in favor of requiring men to adhere strictly to their undertakings, whatever they may be, but there are certain established rules with reference to contracts which are not to be disregarded, no matter how great the hardship may be which grows out of an adherence to them. No doubt, the rule which requires mutuality of obligation with respect to contracts to be performed in the future, where the promise of one party constitutes the sole consideration for the promise of the other, arises from what is regarded by the courts as the inherent unfairness of enforcing a contract which requires performance by one of the parties, but leaves the other party free to accept or reject performance.

*    *    *    *    *    *

"The language of a contract will be construed most strongly against the party preparing it.

*    *    *    *    *    *

"Contracts are ordinarily to be performed by business men, and should be given the interpretation which would be placed upon them by the business world.

*    *    *    *    *    *

"We gather, from the cases in this and other circuits to which we have referred that, where a contract is so lacking in mutuality of obligation or certainty of consideration that it may be canceled, * * * its termination by either party creates no liability for damages resulting from a refusal to carry on.

*    *    *    *    *    *

"We have much sympathy with the theory upon which the case was disposed of in the court below. It seems fair that, after having spent six years in developing the territory assigned to it, the Reno Company should have been permitted to continue or should have been compensated for the injury done it by having its business taken away. However, the injury done to the Reno Company was one against which its contract, rather obviously, did not afford protection."

In Tamm v. Ford Motor Co., 8 Cir., 80 F.2d 723, the court, at pages 729, 730, referring to a franchise similar to those relied on by defendant in the present case, which forced a dealer into bankruptcy because of the manufacturer's failure to deliver automobiles, said:

"If the petition shall be considered as an action based on a breach of a written

contract, of which it bears some earmarks, then plaintiff fares no better. For the contract of which only a fragment is set out in the petition does not, we repeat, bind the defendant to sell any given number of cars, trucks, or parts thereof to the bankrupt, nor does it fix any period whatever to its duration. In these respects it is difficult to distinguish the contract in the case at bar from those held unenforceable [citing cases]. Indeed a mere glance at the four petitions and the exhibits thereto, * * * confirms the view, that when all of the facts shall have been developed before a court on a trial on the merits, recovery by plaintiff on the law, and the facts now visible and pleaded is not possible.

"This may under the facts involve a hardship, but the time to guard against such hardships is when men make improvident contracts, and not when such contracts come before the courts. This thought was well expressed by Judge Parker in the late case of Ford Motor Co. v. Kirkmyer Motor Co., 65 F.2d 1001, at page 1006, wherein he says:

" 'It appears that plaintiff has been disappointed in its expectations and has been dealt with none too generously by the defendant; but, while we sympathize with its plight, we cannot say from the evidence before us that there has been a breach of binding contract which would enable it to recover damages. While there is a natural impulse to be impatient with a form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we cannot make contracts for parties or protect them from the provisions of contracts which they have made for themselves. Dealers doubtless accept these one sided contracts because they think that the right to deal in the product of the manufacturer, even on his terms, is valuable to them; but, after they have made such contracts, relying upon the good faith of the manufacturer for the protection which the contracts do not give, they cannot, when they get into trouble, expect the courts to place in the contracts the protection which they themselves have failed to insert.' "

Directing its attack against the control of the automotive industry by such means as the franchises herein, plaintiff emphasizes that:

" * * * the situation became so intolerable, and the arbitrary control by the manufacturer through the instrumentality of these one-sided instruments, so flagrant, that in 1939 the Federal Trade Commission [see Public Resolution No. 87, 75th Congress; also H. J. Res. 594] made a thorough investigation of factory-dealer relationships in the automobile industry, with a view to recommending legislation which would put an end to the feudalistic system to which we shall presently refer. The Commission found that the factories were 'imposing on their respective dealers unfair and wholly inequitable conditions of trade' and that such practices call 'for remedial action'. These deplorable conditions, however, and the inability of the dealer to obtain judicial relief by suing for breach of the franchise have come about because the dealer is faced with a void instrument,—one which he cannot enforce because it is not a contract, and has nothing in it which gives him any protection. Cases of the type of the one at bar, aside from those involving actual fraud, provide about the only situation in which the courts have been able to afford a remedy to the dealer for his sometimes overwhelming losses caused by cancellation of his franchises."

Despite this, however, the "remedial action" has not arrived. See Huffman v. Paige-Detroit Motor Car Co., supra, 262 F. 116.

In Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618, 619 (affirming a judgment of dismissal of an action based on plaintiff's claim of unlawful cancellation of a franchise in some respects similar to those of the instant case), the court points out:

"Most sharply controverted is the question of the validity of the contract. Plaintiff contends that it lacks mutuality. In short, it is unilateral.

* * * * * *

"We are convinced that the agreement before us is not unilateral and is valid."

The authority strongly relied on by defendant is Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167. The franchise, like those at bar, provided for termination on notice, right to repurchase, and was without specific provision relative to orders already made and not completed by delivery. Judge Parker, speaking for a divided court, said, 80 F.2d at pages 170, 171:

"As the plaintiff was not bound to make deliveries under the contract, therefore, it was void for lack of mutuality in so far as it provided for future sale or purchase. The law is well settled that, where a contract for the future delivery of personal property confers upon either party an arbitrary right of cancellation prior to delivery, it is lacking in mutuality and will be held binding upon the parties only to the extent that it has been performed. [Citing cases.] And, with respect to distributor's contracts, like that here under consideration, it is equally well settled that such a contract, which does not bind the manufacturer to sell and deliver, and which is terminable at will, imposes no liability upon him if he terminates it or refuses to make deliveries to the dealer. [Citing cases.] As pointed out by Judge Hook in the case of Huffman v. Paige-Detroit Motor Co., supra, the contract merely 'furnished a basis for future dealings to be observed no longer than was mutually satisfactory. There was no hard and fast commitment of either party if he chose to break away.'

"It is argued that there was a breach of the contract, in that it was terminated without the giving of the 30-day notice provided and that damages should be allowed, in any event, with respect to the two carloads of refrigerators actually ordered prior to its termination. As pointed out above, however, the plaintiff had the option to purchase at cost all refrigerators which the defendant had on hand when notice of cancellation should be given; and the law would not require the vain formality of delivering the refrigerators ordered to the end that the option of buying them back might be exercised. The failure to ship the refrigerators under the circumstances was a practical exercise of the option; and, even if there was a technical breach of the contract in terminating it without giving the 30-day notice provided therein, defendant could have sustained nothing more than nominal damages from the breach.

\*   \*   \*   \*   \*   \*

"Such contracts as those we have here, between manufacturers and distributors of goods, reserving to the manufacturer an arbitrary and unrestricted right of cancellation, are not uncommon. And while, as we said in the Kirkmeyer Case, there is a natural impulse to be impatient with the form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we do not make the contracts for the parties, and we cannot protect them against lawful agreements and conditions which they may see fit to make for themselves. It is no doubt true that the manufacturer who is seeking distributors for merchandise for which he has largely created the consumers' demand by expensive advertising campaigns feels that he must keep control over the distribution of the product, and that distributors are willing to incur expense in preparing to handle such a product, even though their contracts may be terminable at the will of the manufacturer, in the hope that the business which they will build up will lead to the continuation of the relationship thus established. Where parties deal upon such a basis, however, they cannot invoke the aid of the courts when their expectations are disappointed. Our function is to interpret and enforce contracts, not to make or extend them."

A like situation exists in the case at bar. The cases cited by plaintiff are impressive but not controlling, in the light of the decisions of the Court of Appeals in this and other circuits holding that the function of the court is to interpret contracts in suit, and not make or extend them.

This case is one of many in which the parties involved are corporations created to deal in a highly specialized business, the management of which is comprised of skilled and experienced men of business, experts in industry, to whom the words of limitation as to the rights of the dis-

722

tributor and dealer are well known and understood. Suits for breach of franchises similar to those of the instant case have been before the courts so often there can be little doubt as to the outcome, for, as plaintiff's counsel has so well expressed it, "the dealer or distributor has in practically all instances been denied relief." Plaintiffs in such cases, no doubt, always enter into the franchise deals in the forlorn hope that they will be dealt with fairly. But when a plaintiff manacles its business with this type of contract under facts such as stipulated in the present case, the court can give no remedial relief, especially when the parties deal on the basis disclosed by the record herein.

██ There is much force in the contention of counsel that the franchises make no mention of future deliveries of orders already made by plaintiff and accepted by defendant prior to cancellation. The inclusion in the franchise agreements of words of cancellation with reference to all future orders, while desirable when measured in the light of what later transpired, would accomplish no more, in my opinion, than the exercise of the option to repurchase, if defendant saw fit so to do. Motor Car Supply Co. v. General Household Utilities Co., supra, 80 F.2d 167.

Construing the language of the contract most strongly against defendant, I cannot do otherwise than conclude that plaintiff knowingly became a party to a contract that was valid and binding, and which did not protect it from the disasterous results of the termination therein provided for. I hold that the contracts pleaded by plaintiff were but preliminary moves in the conduct of business necessary to the carrying out of the terms of the franchises, subject to termination, and terminated, without liability on the part of defendant under provisions of the franchises.

Plaintiff's motion for summary judgment is denied.

Defendant's motion for summary judgment must be granted.

It is so ordered.

Plaintiff may have an exception.