## MYERS MOTORS, Inc. v. KAISER–FRAZER SALES CORPORATION.

### No. 13978.

United States Court of Appeals
Eighth Circuit.

Nov. 29, 1949.

Elvero J. McMillan, Duluth, Minn. (James G. Nye, George W. Atmore, and Gillette, Nye, Montague, Sullivan & Atmore, Duluth, Minn., on the brief), for appellant.

Pierce Butler, St. Paul, Minn. (Irving Clark, John L. Hannaford, Doherty, Rumble, Butler & Mitchell, St. Paul, Minn., and Willkie, Owen, Farr, Gallagher & Walton, New York City, on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

COLLET, Circuit Judge.

On December 31, 1945, the defendant-appellee and the plaintiff-appellant entered into a distributor's franchise agreement, under the terms of which the plaintiff was designated as the representative of the defendant in the distribution and sale of Kaiser and Frazer automobiles in the area described in the agreement.[1] This fran-

1. This agreement was actually executed between the plaintiff and the Graham-Paige Motors Corporation; but since the defendant herein has assumed all the obligations and succeeded to all the rights of that contract and any others

chise agreement provided, among other things, that defendant could cancel the business relationship with plaintiff on 90 days notice for cause [2] and that plaintiff could cancel the agreement on 60 days notice for any reason.[3] As the context of the franchise agreement quoted in the margin states, this franchise agreement provided that in the event of its termination by either party—*"Neither party shall be liable to the other for damages of any kind or character whatsoever on account of any termination of this Agreement provided for in this or the preceding paragraph."* (The preceding paragraph is Paragraph Thirteen, quoted in the margin.)

In February, 1946, plaintiff and defendant executed a "direct dealer's franchise", which in substance and effect constituted plaintiff a direct dealer, as well as a distributor. Thereafter, the defendant invited the plaintiff to indicate by an order therefor how many cars plaintiff in its "best judgment" could sell in its territory over an extended period of time. Plaintiff ordered under the distributor's franchise agreement 1500 Frazer automobiles [4] and under the direct dealer's franchise agreement 400 Kaiser automobiles,[5] and on June 2, 1947, 100 Frazer Model F-47-C Manhattans.[6] The significant provisions of these orders for the purpose of this controversy are the same and are as follows: "Kaiser-Frazer Corporation [Graham-Paige Motors Corporation] assumes no liability to the di-

rect dealer [distributor or dealer] nor does the direct dealer [distributor or dealer] have any claim of any kind against the Kaiser-Frazer Corporation [Graham-Paige Motors Corporation] by reason of any delay in delivery under this order for any reason whatsoever." By previous letter of March 28, 1946, in response to an inquiry by plaintiff as to how long a period the order should cover, the defendant advised plaintiff that it might cover several months, or through the entire calendar year of 1946, or through the model year of 1947—whichever plaintiff preferred. That letter then stated: "This was left wholly to your own good judgment. However, we feel that in placing your order, it should cover an extended period of time so that you will have a sufficient order bank authorized to assure you of getting all of the Kaiser cars to which you are entitled when production begins." Plaintiff did not, however, in its order indicate any time within which the cars were to be delivered and, as heretofore noted, absolved defendant of any responsibility in damages for any delay in delivery of any of the cars for any reason whatsoever.

A letter, dated February 8, 1946, from defendant to all Frazer distributors, said that the number of cars which would be available to each distributor was to be determined by the application of three factors, to wit: "1. Total new car registrations in each distributor's territory versus the Unit-

---

involved in this action which were executed between the plaintiff and the Kaiser-Frazer Corporation, all of the instruments will be treated as having been made between plaintiff and this defendant.

2. "Development of Sales Area.
Thirteen. Distributor shall develop, to the satisfaction of Graham, the sales area allotted to him hereunder. If, in the sole opinion and discretion of Graham, Distributor shall not so develop his sales area or shall not comply with any of the other requirements hereof. Graham may terminate this Agreement upon ninety (90) days notice to Distributor."

3. "Termination
Fourteen. Distributor may, with or without cause, terminate this Agreement up-

on sixty (60) days notice to Graham. The death, receivership, bankruptcy, suspension of business or dissolution of Distributor shall be considered a termination hereof without further action by Graham. Neither party shall be liable to the other for damages of any kind or character whatsoever on account of any termination of this Agreement provided for in this or the preceding paragraph."

4. Quoted in Paragraph 13 of Stipulation, infra.

5. Quoted in Paragraph 13 of Stipulation, infra.

6. Quoted in Paragraph 18 of Stipulation, infra.

ed States total, for the calendar year 1941. 2. Total number of dealers of record in each distributor's sales area. 3. Changes in population, resulting from the war, insofar as can be determined from current available statistics."

Pursuant to the franchise agreement and these orders, defendant delivered to plaintiff, and plaintiff paid for, 18 Kaiser automobiles, 68 Frazer automobiles, and 5 Frazer-Manhattan automobiles.

On March 5, 1947, the defendant wrote plaintiff a letter cancelling plaintiff's direct dealer franchise and plaintiff's distributor's franchise upon the ground that plaintiff had failed to maintain a proper place of business and to maintain proper service and parts facilities and develop the sales area. The letter gave notice that the franchise agreements were being terminated "in accordance with the provisions of Paragraph 13 of the Distributors Franchise [7] and Paragraph 12 of the Direct Dealers Franchise,[8] and subject to the terms set forth in such paragraphs." This meant, of course, that, if the notice of termination was valid and effective, all of the business relationships theretofore existing between plaintiff and defendant would be terminated 90 days from the date of the notice. After this notice of termination was given, several cars were delivered to plaintiff under the various orders therefor and, in fact, the order for the 100 Frazer Manhattans was made and the five cars delivered thereunder subsequent to this termination notice of March 5. The defendant did terminate all deliveries to plaintiff early in June, 1947. This action is brought to recover damages of $171,900 for the failure to deliver 382 Kaiser automobiles, for $303,925 for defendant's failure to deliver 1432 Frazer automobiles, and for $28,125 for failure to deliver 95 Frazer Manhattan automobiles. The petition is predicated upon the assumption that these orders were binding contracts in themselves. No reference is made in the petition to the existence of the franchise agreement and its cancellation clause. The defendant set up the cancellation clause of the franchise agreement in its answer as a defense. The record discloses an admirable use of pretrial procedure by the parties and the court. As a result thereof, all the facts were stipulated and the issues were clearly defined. No better statement of the facts can be made than to set forth the stipulation of the parties and to incorporate herein by reference the statement of the case contained in the trial court's memorandum opinion. 83 F.Supp. 716. That stipulation, excluding the numerous and lengthy exhibits attached thereto, is as follows:

It is Stipulated between the parties hereto by their respective attorneys that the following (except as to the question of damages, if any, to which plaintiff is entitled, which question is reserved for further consideration and decision as hereinafter stipulated) are the issues in this case:

(a) Did plaintiff and defendant (or defendant's predecessors, to whose liability defendant admittedly has succeeded) enter into a contract for the purchase by the plaintiff and sale by the defendant (or predecessors) of 400 Kaisers? 1,500 Frazers? or 100 Manhattans? or any one or more automobiles? If so, was such contract performed?

(b) If plaintiff and defendant entered into any one or more contracts for specified numbers of cars, were those contracts subject to termination, and terminated, with-

---

7. Heretofore quoted in the margin.

8. "Development of Sales Area
Twelve. Dealer shall develop to the satisfaction of Kaiser, the sales area allotted to him hereunder. If, in the sole opinion and discretion of Kaiser, Dealer shall not so develop his sales area or shall not comply with any of the other requirements hereof. Kaiser may terminate this Agreement upon ninety (90) days notice to Dealer.
"Termination

"Thirteen. Dealer may, with or without cause, terminate this Agreement upon sixty (60) days notice to Kaiser. The death, receivership, bankruptcy, suspension of business or dissolution of Dealer shall be considered a termination hereof without further action by Kaiser. Neither party shall be liable to the other for damages of any kind or character whatsoever on account of any termination of this Agreement provided for in this or the preceding paragraph."

out liability on the part of the defendant (or its predecessors) under provisions of the franchise instruments between plaintiff and defendant (or defendant's predecessors, rights of which admittedly accrued to defendant)?

It Is Further Stipulated that the following facts are true and are the facts to be considered by the Court in determining the foregoing issues:

1. Plaintiff is and at all times herein mentioned was a corporation duly incorporated under the laws of the State of Minnesota, and at all times material hereto was and still is engaged in the business of selling motor vehicles with a place of business in Duluth, Minnesota.

2. Defendant is a corporation duly incorporated under the laws of the State of Michigan.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

4. Defendant is a wholly owned subsidiary of Kaiser-Frazer Corporation, a Nevada corporation, engaged in the business of selling automobiles and automobile chassis manufactured by Kaiser-Frazer Corporation. The automobiles sold by defendant and herein referred to as "Frazers" and "Manhattans" were, until February 10, 1947, manufactured by Graham-Paige Motors Corporation, an affiliate of said Kaiser-Frazer Corporation, and since said date have been and now are manufactured by said Kaiser-Frazer Corporation. The cars herein referred to as "Kaisers" are and at all times have been manufactured by said Kaiser-Frazer Corporation.

5. On or about December 31, 1945, Graham-Paige Motors Corporation and plaintiff executed and delivered an instrument entitled "Distributors Franchise Automobiles", a copy of which is attached hereto marked Exhibit "A" and made a part hereof. All rights and obligations, if any, of Graham-Paige Motors Corporation under said Exhibit "A" were duly assigned to and assumed by the defendant with the consent of the plaintiff, and such rights and obligations, if any, are now owned by and imposed on defendant.

6. On or about February 25, 1946, Kaiser-Frazer Corporation and plaintiff executed and delivered an instrument entitled "Direct Dealers Franchise Automobiles", a copy of which is hereto attached marked Exhibit "B" and made a part hereof. All rights and obligations, if any, of Kaiser-Frazer Corporation under said Exhibit "B" were duly assigned to and assumed by the defendant with the consent of the plaintiff, and such rights and obligations, if any, are now owned by and imposed on defendant.

7. On or about February 8, 1946, defendant's predecessor, Graham-Paige Motors Corporation dispatched and plaintiff the following day received, the following letter:

"Graham-Paige Motors Corporation
"Willow Run, Michigan
"February 8, 1946
"To All Frazer Distributors:
"Subject: Frazer New Car Order Authorization
"Under date of January 14, 1946 Mr. Cooper wrote you, attaching a report showing 1941 new car registrations, by counties, covering your sales area.

"That letter pointed out that the percentage of registrations in your territory to the United States total, for the same period of time, would constitute one of three factors which would be considered in determining the distribution of new Frazer cars, available each month.

"To repeat, those three factors are:
"1. Total new car registrations in each distributor's territory versus the United States total, for the calendar year 1941.

"2. Total number of dealers of record in each distributor's sales area.

"3. Changes in population, resulting from the war, insofar as can be determined from current available statistics.

"Now that our new cars have been publicly displayed and you have had an opportunity to feel the impact of the unprecedented reception accorded their premier showing in New York City we feel that the time is opportune for you to enter your order covering the anticipated requirements of your own retail operation as well as all of your dealers who have been, and will be, appointed throughout your entire sales area

—that is, in every community where competitive cars are represented.

"We are anxious to compile, at the earliest possible date, the national Frazer requirements of our distributors and dealers in order to support the steps which have already been taken to materially increase the productive capacity of our plants in line with Mr. MacDonald's telegram of January 29, 1946.

"While in due time we will build cars to distributors' and dealers' specifications, as selected from our body colors, trim and optional special equipment which will from time to time be established, it is impractical for us to undertake this for some time to come; therefore, in completing the attached Order Authorization it will be necessary for you to specify only the number of cars, method of shipment and how payment is to be made.

"Until further notice, it is our intention to ship all new Frazer cars directly to the distributor for distribution in his own territory. Later it will be possible to make shipments direct to your dealers if you desire. You will hear further from us regarding this phase of our distribution plans at a later date.

"We will also write you in the near future, giving you the items of special equipment, color combinations and trim which will be available.

"A form similar to the attached Frazer New Car Order Authorization will be forwarded shortly to all Kaiser Direct Dealers.

"Sincerely,
"Earl D. Studer,
"Distribution Manager
"EDS:vh
"Attachment"

The "Frazer New Car Order Authorization" referred to in the last paragraph of the foregoing letter and attached thereto is the same (but without the blanks filled in) as the form which was used, after having been filled in, in the documents quoted in paragraph 13 of this Stipulation.

8. On or about March 18, 1946, defendant's predecessor, Kaiser-Frazer Corporation, dispatched and the following day plaintiff received, the following letter:

"Kaiser-Frazer Corporation
"Willow Run, Michigan
"March 18, 1946

"To: All Kaiser Direct Dealers
"Subject: Kaiser New Car Order Authorization

"On February 8, we wrote all Frazer distributors requesting them to submit immediately a firm order covering new Frazer car requirements for their entire territory, of which your sales area forms a part.

"We are now desirous of receiving similar firm orders from all Kaiser direct dealers covering their new Kaiser car requirements.

"We are accordingly attaching an order blank in duplicate, the original of which should be filled in, signed and returned directly to this office immediately. The duplicate copy is to be retained for your files.

"In determining the number of Kaiser cars you wish to buy, we are anxious that you carefully consider your own market possibilities, and place your order for an extended period of time, without regard to the number of automobiles sold in your sales area during pre-war years * * * in other words, use your own best judgment.

"Your shipping instructions will indicate your preference for either rail, truck, or drive, and the name of the carrier, or company, which will handle these shipments. The shipping destination also is to be shown. In most cases, this will be your own town, however, in the case of rail shipments, some other town in your area may be preferred because of better unloading facilities at that point.

"For 'Method of Payment', in the case of rail shipments, you should show the name of the bank on which a draft is to be drawn, the name of the finance company which is to pay for your cars at the factory, or indicate that payment is to be made at the factory by certified check. If shipment is to be made via truck or drive, indicate

which of the last two methods is to be used —finance company or certified check.

"Sincerely,
"Earl D. Studer,
"Distribution Manager
"EDS:vf
"Att."

9. On or about March 19, 1946, defendant's predecessor, Kaiser-Frazer Corporation, dispatched, and the following day plaintiff received, the following letter:

"Kaiser-Frazer Corporation
"Willow Run, Michigan
"March 19, 1946
"Myers Motors, Inc.
"216 E. Superior St.
"Duluth, Minnesota
"Gentlemen:

"On February 8, 1946, we wrote requesting your blanket order authorization for shipment of the number of Frazer cars acceptable to you in any body type, color, upholstery and equipment available at the time of shipment.

"We have not received this authorization, therefore, we are enclosing duplicate copies. We ask that you execute and return immediately, showing the anticipated requirements for an extended period of time for your own retail operation, as well as all of your dealers who have been, or will be appointed throughout your sales area.

"Your immediate attention to this matter will be appreciated.

"Sincerely,
"Earl D. Studer,
"Distribution Manager.
"EDS:asc
"Enc.
"CC: Mr. H. W. Taylor
"Regional Manager
"Hollywood Apts., Apt. 2
"1816 Stevens Avenue
"Minneapolis, Minn."

10. On or about March 26, 1946, plaintiff dispatched, and the following day defendant's predecessor, Kaiser-Frazer Corporation, received, the following letter:

"26 March 1946
"Mr. Earl D. Studer
"Distribution Manager

"Kaiser-Frazer Corporation
"Willow Run, Michigan
"Dear Mr. Studer:

"With reference to your letter of 19 March relative to blanket order for both Kaiser and Frazer automobiles. Will you please advise us immediately as to the following questions:

"1. Do you wish this order to cover the first years production with calendar or model year?

"2. On your order blank, we note that no provisions have been made for boat shipment and as that is the way most of our cars will be shipped, how do you want us to handle the payment? We have arranged with several banks here to have you draw on them but we notice that the bank name is given for rail only.

"Will you please advise us as to the above at once so that we may immediately send in our order for both Kaiser and Frazer.

"Yours very truly,
"Myers Motors, Inc.,
"C. B. Myers
"President
"CBM:bh

11. On or about March 28, 1946, defendant's predecessor, Kaiser-Frazer Corporation, dispatched, and the following day plaintiff received, the following letter:

"Kaiser-Frazer Corporation
"Willow Run, Michigan
"March 28, 1946
"Mr. C. B. Myers, President
"Myers Motors, Inc.
"216 East Superior Street
"Duluth 2, Minnesota
"Dear Mr. Myers:

"In reference to your letter of March 26, your Kaiser order may cover several months, through the entire calendar year of 1946, or through the model year 1947— whichever you prefer. This was left wholly to your own good judgment. However, we feel that in placing your order, it should cover an extended period of time so that you will have a sufficient order bank authorized to assure you of getting all of the Kaiser cars to which you are entitled when production begins.

"It is possible that boat shipments will be made when we get in production, there-

fore, if you have a preference for this type of shipment, please inform us accordingly, and your method of payment which you would apply to any rail shipments could also be used in connection with the boat shipments you may want.

"Sincerely,

"Earl D. Studer,

Distribution Manager"

"EDS :asc

12. On or about April 10, 1946, plaintiff dispatched, and the following day defendant's predecessor, Kaiser-Frazer Corporation, received, the following letter:

"10 April 1946

"Mr. Earl D. Studer
"Distribution Manager
"Kaiser-Frazer Corporation
"Willow Run, Michigan
"Dear Mr. Studer:

"Enclosed please find our orders for 1500 Frazer automobiles and 400 Kaiser automobiles. We would like to have these shipped Rail until the opening of navigation, after which we wish our cars to be shipped by Lake Carrier.

"The Lake Carrier service was discontinued during the war and as yet we do not know just what the set-up will be, but as soon as we do we will advise you.

"We trust that the enclosed is in order.

"Yours very truly,

"Myers Motors, Inc.,

"C. B. Myers

President

"CBM :bh
"enc."

13. Enclosed with the letter last above mentioned were the following documents duly signed by plaintiff:

"Date 10 April 1946
"Region Minneapolis
"Kaiser-Frazer Corporation
"Willow Run, Michigan
"Attention: Distribution Manager
"Gentlemen:

"Please accept this as our firm order for 400 Kaiser cars. We will accept these cars in any body type, color, upholstery and equipment available at the time of shipment.

"This order adopts and incorporates the provisions set forth in the current price schedule in effect on the date of shipment and the terms of purchase subject to which orders have been accepted from the undersigned by Kaiser-Frazer Corp. Kaiser-Frazer Corp. assumes no liability to the direct dealer, nor does the direct dealer have any claim of any kind against Kaiser-Frazer Corp., by reason of any delay in delivery under this order for any reason whatsoever.

"Below we have indicated the method of shipment and payment to be used in connection with this order.

"Method of
Shipment Rail until opening     Via .................
   of navigation, then by Lake Car-     (Name of
   rier                                 Carrier)
Shipping to be advised later.
Destination Duluth, Minnesota
Payment to
be made by
Direct Dealer
through—           Certified Check
                   at Factory ...........................
Bank (Rail Only)  Minnesota National Bank,
                   Duluth, Minn.
                   (Name of Bank)

Finance Co.
at Factory     Universal Cit Credit Corporation
               (Name of Finance Co.)
Direct Dealer
Firm Name       Myers Motors, Inc.
By              C. B. Myers, Pres.
City and State  Duluth, Minnesota
Note:  Duplicate copies furnished.  Direct dealer
       will forward original to factory and retain
       copy."

*   *   *   *   *   *

"Date 10 April 1946
"Region Minneapolis
"Graham-Paige Motors Corp.
"Automotive Division
"Willow Run, Michigan
"Attn: Distribution Manager
"Gentlemen:

"Please accept this as our firm order for 1500 Frazer Cars. We will accept these cars in any body type, color, upholstery and equipment available at the time of shipment.

"This order adopts and incorporates the provisions set forth in the current price schedule in effect on the date of shipment and terms of purchase subject to which orders have been accepted from the undersigned by Graham-Paige Motors Corp. Graham-Paige Motors Corporation assumes no liability to the distributor or dealer, nor does the distributor or dealer have any

claim of any kind against Graham-Paige Motors Corporation, by reason of any delay in delivery under this order for any reason whatsoever.

"Below we have indicated the method of shipment and payment to be used in connection with this order.

"Method of
Shipment    Rail until opening of navigation, then by Lake Carrier to be advised later.
Via .......................................
           (Name of Carrier)
Payment to
be made by
Distributor
through—Cash at Factory ....................
Bank (Rail Only)  Minnesota National Bank,
                  Duluth, Minn.
                  (Name of Bank)
Finance Co. at Factory   Universal CIT Credit
                         Corporation
                         (Name of Finance Co.)
Distributor
Firm Name        Myers Motors, Inc.
By             - C. B. Myers, Pres.
City and State   Duluth, Minnesota
Note. Duplicate copies furnished. Distributor will
      forward original to factory and retain copy."

14. On or about May 13, 1947, defendant dispatched, and plaintiff duly received, the following telegram:

"Western Union
WU D61 PD WUX Willow Run ICH 13 208P 1947
                                     May 13
                                     PM 3:29
Myers Motors Inc.—
412 E First St.
Retels. Unable Arrange Factory Drive Away Manhattan Since You Are Beyond 450 Mile Drive Zone. Price Announcement For You And Your Dealers Being Mailed. Will Include Manhattan In Next Shipment Of Cars Going To You. Advise Satisfactory—
                         Earl D Studer
                         Kaiser Frazier Corp
                              450
                         May 13 Rec'd
                         4:25 P. M.
                         A.H."

15. On or about May 14, 1947, defendant dispatched, and plaintiff duly received, the following telegram:

"Western Union
MA750 NL PD—WUX Willow Run Mich 14 1947 May 14
                                     PM 10 09
Myers Mtrs Inc—
    412 East 1 St. Dlth—
Retel Studer 13th Please Forward Order For Manhattans For Early Shipment To You. Advise—
                         Kaiser Frazer Witt."

16. On or about May 15, 1947, plaintiff dispatched, and defendant received, the following telegram:

"Western Union
                                     May 15, 1947
Mr. Witt
Kaiser Frazer Corp.
Willow Run, Mich.
This Your Authority Blanket Order To Ship 100 Manhattans.
                         Myers, Motors,Inc.

17. On or about May 19, 1947, defendant dispatched, and plaintiff received, the following telegram:

"Western Union
                         1947 May 19 PM 12 15
MA276 DL PD—WUX Willow Run Mich 19 1142A

Myers Motors Inc—
    412 East First St DLTH—
Retel 15. Your Order 100 Manhattans Being Entered However Little Likelihood That We Can Ship More Than Five By End Of This Month. Although We Cannot Promise 5 Manhattans This Month We Will Do Our Best To Ship That Total—
    Earl Studer  Kaiser Frazer Corp."

18. On or about June 2, 1947, plaintiff dispatched, and defendant the following day received, the following letter duly signed by plaintiff:

"Date June 2, 1947
"Region  Minneapolis
"Kaiser-Frazer Sales Corporation
"Willow Run, Michigan
"Attention:  Earl D. Studer
             "Distribution Manager
"Gentlemen:
"Please accept this as our firm order for 100 Frazer Model F-47C Manhattans. We will accept these cars in any color, upholstery or equipment available at the time of shipment.

"This order adopts and incorporates the provisions set forth in the current price schedule in effect on the date of shipment and terms of purchase subject to which orders have been accepted from the undersigned by Kaiser-Frazer Sales Corporation. Kaiser-Frazer Sales Corporation assumes no liability to the distributor, nor does the distributor have any claim of any kind against Kaiser-Frazer Sales Corporation, by reason of any delay in delivery under this order for any reason whatsoever.

"We authorize the factory to use the same method of shipment and payment

previously specified for our car shipments.

"Distributor

"Firm Name   Myers Motors, Inc.

"By C. B. Myers

"President (Individual Authorized to Sign)

"City and State   Duluth, Minnesota

"Note: Duplicate copy furnished. Distributor will forward original to the factory and will retain copy.

"This Will Confirm Our Telegram Of May The 15th 1947."

19. On or about March 15, 1947, defendant dispatched to plaintiff, and plaintiff received, the following letter. It is expressly stipulated and agreed, however, that this letter does not constitute proof of any of the statements made as statements of fact in the letter, but only of the opinion of the defendant and of the sending and receipt of the letter:

"Kaiser-Frazer Sales Corporation

"Willow Run, Michigan

"March 5, 1947

"Myers Motors Inc.

"412 East First Street

"Duluth 2, Minnesota

"Dear Sirs:

"This refers to the agreement between Graham-Paige Motors Corporation and your company dated December 31, 1945, and designated 'Distributors Franchise Automobiles' which agreement has been assigned to this company, notice of which assignment was given to you by letter dated February 20, 1947; and also to the agreement between Kaiser-Frazer Corporation and your company dated February 25, 1946, and designated 'Direct Dealers Franchise Automobiles' which agreement was assigned to this company July 11, 1946.

"As pointed out in our letter to you of February 26, 1947 (your letter of February 27, 1947, notwithstanding), you have failed to provide satisfactory facilities in keeping with the value of the franchise you hold, all of which reflects itself in the over-all job of proper development of your sales area. You have failed to maintain a place of business including salesroom, service station, parts department and used car facilities satisfactory to our company as required by Paragraph 10 of the Distributor's Franchise and by Paragraph 9 of the Direct Dealers Franchise. Therefore, in our opinion, you have failed to develop your sales area and to comply with certain of the requirements of said agreement.

"Notice is hereby given of the termination of said agreements dated December 31, 1945, and February 25, 1946, in accordance with the provisions of Paragraph 13 of the Distributors Franchise and Paragraph 12 of the Direct Dealers Franchise, and subject to the terms set forth in such paragraphs.

"Yours very truly,

"Kaiser-Frazer Sales

"Corporation

"W. A. MacDonald

"Vice President in Charge of Sales

"ERG:b

"Mar 6 Rec'd"

20. On or about June 13, 1947, defendant dispatched, and plaintiff received, the following telegram:

"Western Union

1947 June 13 AM 8 36

MA 111 DL PD-WUX Willow Run Mich

13 847 A

Myers Motors Inc—

412 East First St Dlth—

Retel June Sixth No Further Shipments Of Automobiles Will be Made To You As Our Records Show That Notice Of Termination Given Under Date Of March 5, 1947 Is Now Effective In Accordance With Terms Of Your Distributor Franchise Agreement—

Earl D. Studer

Kaiser-Frazer Sales Corp.'

21. At all times material herein, and up to and including the present, defendant's predecessors manufactured and sold, and defendant sold, one body type of automobile only, to wit: a four-door sedan.

22. From and including the month of September 1946, to and including the month of June 1947, defendant, or its predecessors, shipped to plaintiff, and plaintiff duly re-

ceived and paid for, automobiles in accordance with the following schedule (it being stipulated that the notations under the asterisks are true):

"Shipments to Myers Motors, Inc.—Duluth, Minnesota

| | 1946 Sept. | Oct. | Nov. | Dec. | 1947 Jan. | Feb. | Mar. | Apr. | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kaisers* (Special only) | 1 | 1 | 4 | 0 | 2 | 2 | 0 | 4 | 2 | 2 | 18 |
| Frazers** (except Manhattans) | 5 | 0 | 7 | 4 | 15 | 1 | 8 | 12 | 14 | 2 | 68 |
| Frazers** Manhattans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 |

91

Defendant and its predecessors have refused to deliver, and have not delivered any automobiles to plaintiff other than as shown by the above schedule.

23. The current price schedules as to "Kaisers", "Frazers" and "Manhattans" in effect from April 10, 1946, to the date hereof, consisting of 139 sheets, bound together, and marked Exhibit "c", are the price schedules referred to in the orders set forth in paragraphs 13 and 18 of this Stipulation.

24. The following schedule is a correct statement of the number of automobiles manufactured by defendant's predecessors, available for sale and sold by said predecessors and by defendant during the periods indicated, it being understood that the reference therein to "Kaiser Customs" is immaterial to this litigation, which involves only "Kaiser Specials" herein referred to as "Kaiser", "Frazers" and "Frazer Model F-47C Manhattans" herein referred to as "Manhattans":

* Kaisers were sold by Kaiser-Frazer Sales Corporation after July 11, 1946, so all 18 Kaisers here shown were sold to Myers Motors, Inc. by that corporation.

** Frazers were sold by Graham-Paige Sales Corporation until February 10, 1947 and after that date by Kaiser-Frazier Sales Corporation. It is not known whether the one car delivered to Myers Motors, Inc., in February was

"Total Manufactured by Model & Years

| | 1946 | 1947 | 1948 (Sept. 10) | Total |
|---|---|---|---|---|
| Kaiser Specials | 7,674 | 66,799 | 81,616 | 156,089 |
| Kaiser Customs | 0 | 5,675 | 5,395 | 11,070 |
| Frazers | 4,079 | 34,099 | 27,428 | 65,606 |
| Manhattans | 0 | 37,933 | 13,315 | 51,248 |
| Total | 11,753 | 144,506 | 127,754 | 284,013 |

Manufactured (Built) by Models
Prior to April 10, 1946
None
April 10, 1946 to June 13, 1947

| | |
|---|---|
| Kaiser Specials | 28,297 |
| Kaiser Customs | 0 |
| Frazers | 21,323 |
| Manhattans | 4,494 |

June 13, 1947 to September 10, 1948

| | |
|---|---|
| Kaiser Specials | 127,792 |
| Kaiser Customs | 11,070 |
| Frazers | 44,283 |
| Manhattans | 46,754 |

Manhattans Manufactured (Built)
Beginning to May 15, 1947

| | |
|---|---|
| Manhattans | 1,988 |

May 15, 1947 to June 13, 1947

| | |
|---|---|
| Manhattans | 2,506 |

June 13, 1947 to September 10, 1948

| | |
|---|---|
| Manhattans | 46,754" |

of which 10% were allocated by defendant (or predecessor) for employees, consignment and export, and the balance were

delivered before or after February 10. If before, that means that of the 68 Frazers shipped to Myers Motors, Inc., 32 were shipped by Graham-Paige Sales Corporation and 36 by Kaiser-Frazer Sales Corporation. If the one February delivery was after February 10, the figures are 31 and 37. Of course, all Manhattans shipped to Myers Motors, Inc., were shipped by Kaiser-Frazer Sales Corporation."

available for sale and shipment to distributors, dealers and other purchasers in the United States.

It Is Stipulated that the typewritten partial transcript of the pretrial conference before the Hon. Dennis F. Donovan on September 3, 1948, and the typewritten transcript of continuation of said pre-trial conference on October 1, 1948, and all agreements and stipulations therein, are to be considered as a part hereof and that in the event that issues (a) and (b) first above described are determined in whole or in part favorably to the plaintiff, a further pretrial conference shall be held to consider the matters mentioned in Rule 16, Rules of Civil Procedure [28 U.S.C.A.], as they relate to the question of damages, and that thereafter trial of the action shall be had upon said question of damages only.

Dated November 27, 1948.

> James G. Nye
> George W. Atmore
> > Attorneys for Plaintiff
> Pierce Butler
> Irving Clark
> > Attorneys for Defendant

A thorough examination of the formal contracts and all of the exhibits either included in or attached to the stipulation leads us to the conclusion that the answer to the first question presented, as to whether the plaintiff and defendant did enter into a contract for the purchase by plaintiff and sale by defendant of 400 Kaiser, 1,500 Frazer, and 100 Manhattan automobiles, is in the affirmative. As to whether or not the contract was performed, the answer is obviously that it was partially performed. The answer to the second question—whether those contracts of purchase were subject to termination and were terminated without liability on the part of the defendant, under the provisions of the franchise instruments—is again, as the trial court concluded, in the affirmative.

Without indulging in observations as to the fairness or unfairness of the agreements as to either of the parties, the situation presented, simply stated, is that at the time that the franchise agreements were made plaintiff became the dealer and distributor of defendant's cars in the area specified, until either plaintiff chose to terminate the agreement or defendant terminated it because of the dereliction on the part of plaintiff set out in the franchise agreement as a basis for possible cancellation. In the event either of the parties cancelled the agreement, the language could not be clearer that the cancellation was to be without any recurring or resulting liability on the part of either of the parties on account of such cancellation. The orders for these 2,000 automobiles were made at a time when it was common knowledge that 2,000 automobiles could not possibly be delivered to one dealer within any reasonable length of time. Hence, it must inevitably have been the understanding of the parties that these orders were, as indicated by the letter of February 8, primarily for the purpose of furnishing a basis of allocation among dealers of whatever number of automobiles the manufacturer could produce from month to month; and were, as the trial court concluded, but preliminary moves in the conduct of business necessary to the carrying out of the terms of the franchise. It is significant that neither in the franchise agreement nor in the so-called "orders" did the defendant agree to deliver any given number of cars within any given length of time. It is disastrous to plaintiff's claim that the orders themselves specifically absolved the defendant from any liability for any delay in the delivery of any cars for any reason whatsoever. Unfair? Those who desire to philosophize on the subject may do so. But we are confronted with the problem of construing the agreement, not in criticizing its terms. In doing so, it may, with propriety, be observed that, although the so-called "orders" apparently permitted the defendant to unload 2,000 automobiles upon the plaintiff at any time that it saw fit to deliver them and collect from the plaintiff therefor, yet it is also common knowledge that during that period of 1946 and 1947 plaintiff could probably have disposed of the cars even before they were received. The fairness or unfairness of the contract only becomes material for our consideration in so far as such consideration does have a

bearing upon the reasonableness of opposing constructions. We need not pursue that subject further, since it is very clear the parties agreed that defendant could desist from delivering the automobiles under the orders for any reason whatever and for as long a time as it saw fit, without incurring liability. The franchise agreement constituted as much of the entire arrangement, or more, than the purchase orders. Under it defendant clearly had the right to terminate the entire relationship without liability, which it did.

It is argued that the franchises have no contractual status, are purely illusory and void, and are of no legal significance. In other words, plaintiff entirely disassociates these contracts from the three order contracts pleaded in the complaint. The facts as shown by the record do not support such a disregard of the franchise. For example, the letter of February 8, 1946, upon which plaintiff relies to support its argument that extended and persistent solicitation of plaintiff's firm orders amounted to offers to sell, was addressed "To All Frazer Distributors" and had the subject "Frazer New Car Order Authorization." If the franchises are disregarded, the meaning of the words "Frazer Distributors" in the sense they were used and understood by the parties becomes a debatable question. By reference to the franchise, the meaning of the words becomes clear and undisputed. Was the plaintiff a distributor? Upon what conditions or limitations? The franchise settles these questions. Similarly, the letter contained the phrases "covering your sales area", "your territory", "your entire sales area". Disregard the franchise contracts and these expressions lose their meaning; regard the provisions of these contracts and their meaning becomes clear and unmistakeable. The letter of March 19, 1946, was addressed to "All Kaiser Direct Dealers." Was plaintiff such a "Direct Dealer"? That question can be answered definitely only by reference to the franchise agreements. What did the parties understand by the term "Direct Dealer"? The franchise contract explains it fully. Plaintiff quotes from the letter of March 28, 1946, and italicizes the words "to assure

you of getting all of the Kaiser cars to which you are entitled when production begins." Was plaintiff entitled to get any cars? That question can only be answered adequately by referring to the franchise contracts. If these are disregarded, plaintiff's argument based upon that clause lacks support.

The letter of March 18, 1946, is cited in support of the validity of the order contracts and as evidence of solicitation of firm orders. Plaintiff quotes from the letter: "On February 8, we wrote all Frazer distributors requesting them to submit immediately a firm order covering new Frazer requirements for their entire territory, of which your sales area forms a part." Disregard the franchise contracts and the meaning of this sentence is lost. The plaintiff signed the orders under the caption "Direct Dealer." Does this have any significance? Only by reference to the franchise contract can any reasonable explanation be made; otherwise, it is so much surplusage. But we think these words are significant and that defendant had a very definite object in requiring plaintiff's order to be submitted on defendant's form in which, if the plaintiff signed the order at all, it must designate it as an order by a "Direct Dealer", and not just an order by the Myers Motor, Inc., in some other capacity. The plaintiff and defendant both understood the significance of the terms, conditions and limitations implied by the words "Direct Dealer", for they had an understanding and had embodied that understanding in a franchise contract. Likewise, the order contracts which are signed by plaintiff under the caption "Distributor" are thus linked by that word with that franchise contract. The price schedules attached as Exhibit C to the stipulation of facts were sent to plaintiff as "Confidential Bulletins" and otherwise showed the same intent of the parties that plaintiff was to be dealt with as belonging to a certain well-defined and restricted classification of distributors of and dealers in automobiles. If the franchise contracts are disregarded we are left without any reasonable explanation of much of the language used in them; yet plaintiff must depend upon these schedules

to maintain the validity of the order contracts.

Many other illustrations could be given from the record showing how inextricably woven into all the dealings between the parties, including the order contracts upon which plaintiff relies, are these franchise contracts. We agree with the trial court that the order contracts pleaded by plaintiff were but preliminary moves in the conduct of business necessary to the carrying out of the terms of the franchises.

The latter were binding agreements between the parties, furnishing a basis for future dealings. However, they were terminable at will by either party, as provided therein, and without damages allowable to either party. They governed the relations of the parties until so terminated. Huffman v. Paige-Detroit Motor Car Co., 8th Cir., 262 F. 116, 118; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 227, 228, 89 A.L.R. 238; Tamm v. Ford Motor Co., 8 Cir., 80 F.2d 723, 729, 730; Buggs v. Ford Motor Co., 7 Cir., 113 F.2d 618; Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167.

The franchises were not contracts for the future delivery of personal property. Cases such as Cold Blast Transportation Co. v. Kansas City Bolt & Nut Co., 8 Cir., 114 F. 77, 57 L.R.A. 696; Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086; and others construing such sales contracts are not applicable here.

It would do violence to the plain intention of the parties as shown not only by the franchises, but in the order contracts and other documents attached to the stipulation of the parties to hold that the order contracts can be considered as contracts separate and distinct from the franchises and uncontrolled by their provisions. We agree with the conclusion of the trial court that they were subject to termination and were terminated without liability on the part of the defendant under the provisions of the franchises.

It is argued that the franchises must necessarily have contained a provision expressly cancelling outstanding automobile sales contracts. The termination paragraph, which is the same in both the distributor and dealer franchises except for the number of days notice required (quoted in margin), and the "Entire Agreement" paragraphs [9] render such provision unnecessary. The order contracts were made before the franchises were terminated and were controlled by them. There is no evidence in the record that the franchises were modified. Furthermore, each franchise contained an optional repurchase provision, essentially the same in each.[10] The law

9. Distributor's Franchise
"Entire Agreement
"Seventeen. This Agreement cancels and supersedes all previous sales agreements and constitutes the entire agreement between the parties for the sale of Graham motor vehicles, except for such price schedules setting forth the price to the Distributor as are specifically referred to herein and are thus incorporated herein by reference. No letter, telegram or communication passing between the parties hereto shall become a part of, or in any way modify or change, this Agreement unless it is distinctly stated therein that the same is to be attached as a rider or appendix hereto, and the same is signed or consented to in writing by both Distributor and Graham."

\* \* \* \* \* \* \*

Direct Dealer's Franchise
"Entire Agreement

"Sixteen. This Agreement cancels and supersedes all previous sales agreements and constitutes the entire agreement between the parties for the Sale of Kaiser motor vehicles, except for such price schedules as are specifically referred to herein and are thus incorporated herein by reference. No letter, telegram or communication passing between the parties hereto shall become a part of, or in any way modify or change, this Agreement unless it is distinctly stated therein that the same is to be attached as a rider or appendix hereto, and the same is signed or consented to in writing by both Dealer and Kaiser."

10. "Optional Repurchase by Kaiser
"Fourteen. Within fifteen (15) days after any termination hereof, Kaiser shall have the option to purchase and receive, and Dealer hereby agrees to sell and deliver in the event that such option

would not require the vain formality of delivering the cars ordered to the end that the option of buying them back might be exercised. See Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167, 171. The case of Berg v. Erickson, 8 Cir., 234 F. 817, L.R.A. 1917A, 648, cited by plaintiff, involved a pasturing contract whereby the defendant agreed to furnish pasturage for certain stock. He was unable to perform on account of a drouth. The court held him liable because he had made an unqualified promise without a protective provision in his contract. The case is not applicable to the facts in the present case.

The case at bar is wholly unlike cases such as Fargo Glass & Paint Co. v. Globe American Corporation, 7 Cir., 161 F.2d 811; S. H. Greene & Sons v. Freund, 2 Cir., 150 F. 721; Dildine v. Ford Motor Co., 159 Mo.App. 410, 140 S.W. 627; Singer Sewing Machine Company v. Brewer, 78 Ark. 202, 93 S.W. 755; Hamilton v. C. L. Best Gas Traction Co., 123 Wash. 488, 212 P. 1077, wherein the courts have, because of peculiar circumstances and the language of agency agreements, held one of the parties liable for cancellation.

The case of Ellis v. Dodge Bros., 5 Cir., 246 F. 764, cited by plaintiff, is unlike the case at bar in that the so-called dealer's agreement was really a sales contract. The court said, 246 F. loc cit. 766, 767: "The language used, and other language in the agreement, is inconsistent with any theory other than that defendant undertook to sell, and plaintiff undertook to buy and pay for, motor cars; and the schedule referred to indicates the number to be bought and the time when they are to be bought and paid for, unless modified by the timely action of the purchaser or the exercise of a reciprocal right on the part of the manufacturer."

The contract contained a cancellation clause, but neither party cancelled the contract before it expired. In Chevrolet Motor Co. v. Gladding, 4 Cir., 42 F.2d 440, the

motor company cancelled the contract for a reason which the jury found to be groundless. The question there was as to the company's liability when the contract had not been cancelled.

The judgment of the trial court in the case at bar is correct and should be and is affirmed.

is exercised, at Dealer's place of business and at Dealer's net delivered purchase price, all new and unused current models of Kaiser motor vehicles which, in the opinion of Kaiser, are in good condition and which Dealer shall have purchased from Kaiser hereunder."