**BALIAN ICE CREAM CO., Inc. v. ARDEN FARMS CO. et al.**

**No. 12434-Y.**

United States District Court
S. D. California, Central Division.

Dec. 26, 1950.

Sheppard, Mullin, Richter & Balthis, by James C. Sheppard and Gordon F. Hampton, Los Angeles, Cal., for the plaintiff.

Gibson, Dunn & Crutcher, Henry F. Prince, Frederic H. Sturdy, Julian O. Von Kalinowski, Cosgrove, Cramer, Diether & Rindge, T. B. Cosgrove, Los Angeles, Cal., for the defendants.

YANKWICH, District Judge.

Pending before the court are several actions instituted by individuals and cor-porations against the same defendants, which seek equitable relief and treble dam-ages under the federal anti-trust laws and double damages under the California state anti-trust act. In each of these cases, there is one cause of action for treble damages under Section 3 of the Act of the Congress of June 19, 1936, [1]—commonly referred to as the "Robinson-Patman Act". The sec-tion reads: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or con-tract to sell, which discriminates to his knowledge against competitors of the pur-chaser, in that, any discount, rebate, allow-ance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or adver-tising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying com-petition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

In the enacting statute, the section was in identical form. The enacting clause of Section 1 of the statute read: "That sec-tion 2 of the Act entitled 'An Act to supple-ment existing laws against unlawful re-straints and monopolies, and for other purposes', approved October 15, 1914, as amended (U.S.C., title 15, sec. 13), is amended to read as follows:" Section 3, however, contains no such reference. The title of the entire Act reads: "An Act To amend section 2 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, *and for other purposes'*, approved October 15, 1914, as amended (U.S.C., title 15, sec. 13), *and for other purposes*." [2] (Emphasis added.)

1. 15 U.S.C.A. § 13a.

2. 49 Stat. 74th Congress, part I, Ch. 592, pp. 1526–1528.

The particular count recites that the defendants on or about November 21, 1949, at Los Angeles, California, initiated a drastic reduction in the wholesale prices charged by Arden Farms Co., a corporation engaged in producing and marketing dairy products, and its subsidiary corporations in the Los Angeles area and extending throughout the State of California for its and their bulk and package ice cream and kindred products. The wholesale base price of "flavor fresh" ice cream was reduced in the Los Angeles area from $1.44 per gallon to $1.06 per gallon, and the defendants, in concert, sold and sell ice cream and kindred products in the area at prices lower than those exacted by them for these products elsewhere in the United States, and especially in the States of Arizona, Oregon, Washington, Idaho and Montana.

The object of the action taken by the defendants,—it is charged,—was to destroy competition and to eliminate the plaintiffs and other competitors in the area. The prices are stated to be "unreasonably low", and detrimental to the plaintiffs. For, while the defendants can offset and recoup their losses through (a) income derived from the sale of ice cream and other dairy products in other areas of the United States at high prices, and (b) income derived from the sale of fluid milk and other milk products in California and elsewhere, the plaintiffs, *being engaged solely in the production of ice cream,* cannot do so.

Damages are claimed in various amounts, which, in the case in which this opinion is filed, are stated to be $72,934.75. Injunction is sought enjoining the continuance of the price and three fold damages.

The defendants have filed motions to dismiss upon the ground that the particular cause of action does not state a claim.

### I. The Relation of the Robinson-Patman Act to Other Legislation.

3. 15 U.S.C.A. § 13a, being Section 3 of the Robinson-Patman Act.

4. 15 U.S.C.A. § 15.

5. 15 U.S.C.A. § 12.

The question raised by the motions is whether a civil action for violation of Section 13a of Title 15 [3] is an action under the "anti-trust laws" of the United States, as provided for in Section 15, which reads: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." [4]

Section 12 defines the anti-trust laws in this manner: " 'Antitrust laws,' as used in sections 12, 13, 14-21, 22-27 of this title, includes sections 1-27, inclusive, of this title." [5]

It is the contention of the defendants that the inclusion of section 13a was not warranted by the source from which it was derived,—section 1 of the Clayton Act. [6]

■ Obviously the original Clayton Act referred to acts then in existence. Enacted in 1914, it aimed to extend to cases arising under it the right of private persons to sue for treble damages which had been conferred in 1890 on persons injured by the monopolistic acts denounced by the Sherman Act [7]. And so it defined anti-trust laws by reference to the Sherman Act, the act then being enacted, and certain tax statutes which had anti-trust features.

The Robinson-Patman Act did not come into existence until 1936. Consequently, when the codifiers consolidated the various anti-trust acts and provisions relating to monopolies and combinations, they reworded the section so as to cover *all* the anti-trust laws then in existence. Impliedly, amendments are included.

■ Whether an act is amendatory of existing law is determined not by title

6. Chapter 323, Sec. 1, 38 Stat. 730. The title of the Act is "An Act To *supplement* existing laws against unlawful restraints and monopolies, and *for other purposes.*" (Emphasis added.)

7. 15 U.S.C.A. §§ 1-7, 15 note.

alone, or by declarations in the new act that *it purports to amend* existing law. On the contrary, it is determined by an examination and comparison of its provisions with existing law. If its aim is to clarify or correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute, the act is amendatory, *even though in its wording* it does not purport to amend the language of the prior act.[8] Whatever supplements existing legislation, in order to achieve more successfully the societal object sought to be obtained *may be said to amend it.* It is evident that the codifiers so considered the particular change. And the annotators of the Code appended to Section 15 of Title 15 the following note: "This section applies to the provisions of this chapter generally and supersedes two former similar sections enacted by act July 2, 1890, c. 647, § 7, 26 Stat. 210 and act Aug. 27, 1894, c. 349, § 77, 28 Stat. 570, each of which were restricted in operation to the particular act cited." In this they gave effect to the congressional policy which, *so far as the Clayton Act is concerned,* was expressed very recently by the Supreme Court in these words: "Congress' concern * * * was to provide broader and more effective relief, both substantively and procedurally,

---

8. United States ex rel. Palmer v. Lapp, 6 Cir., 1917, 244 F. 377, 383.

*"The character of the act must be determined not by the title alone nor whether it professes to be an amendment of existing laws, but by an examination and comparison of its provisions with prior laws which are left in force."* People ex rel. Larson v. Thomson, 1942, 381 Ill. 48, 44 N.E.2d 899, 900. (Emphasis added.)

See, State v. Holly Sugar Corp., 1941, 57 Wyo. 272, 116 P.2d 847, 851–852.

By its very nature, an amendment may clarify, change the old or add new matter. Hise v. McColgan, 1944, 24 Cal. 2d 147, 159, 148 P.2d 616. For this reason, an amendment "is to be read as if it had originally been in the amended form". Blair v. Chicago, 1906, 201 U. S. 400, 475, 26 S.Ct. 427, 446, 50 L.Ed. 801. And see, Pennsylvania Company v. United States, 1915, 236 U.S. 351, 362, 35 S.Ct. 370, 59 L.Ed. 616; United States v. La Franca, 1931, 282 U.S. 568, 576, 51 S.Ct. 278, 75 L.Ed. 551; Baillie v. United States, 8 Cir., 1934, 70 F. 2d 527, 529.

Some years ago the Supreme Court was called upon to determine whether a certain act of the Congress relating to purchase of property of States declared in insurrection was "amendatory" to the Abandoned Property Act of 1863, so as to give the Court of Claims jurisdiction of claims under it, in accordance with the provisions of Section 162 of the Judicial Code. The original Act, 12 Stat. 820, had a special purpose and was directed to the receipt and collection of property in a particular condition, either abandoned or captured. It recognized, as the court said, that there might be a just claim to it, but limited the assertion of the claim to two years after the suppression of the rebellion. The act under consideration, Act of July 2, 1864, 13 Stat. 375, was entitled "An Act in addition to the several Acts concerning Commercial Intercourse between loyal and insurrectionary States, and to provide for the Collection of captured and abandoned Property, and the Prevention of Frauds in States declared in Insurrection." Because the act was declared to be an "addition" to preceding legislation, the court asked the question: *"Is an addition the same as an amendment?"* And it gave this answer: "We are informed by the dictionaries that in addition the added parts remain independent and by amendment there is change and, it may be improvement. *The words and the processes they respectively describe may, however, be regarded as roughly or even accurately interchangeable and in investigating the meaning of legislation we must regard that possibility and resolve a doubt in the words by the purpose of the legislation.* In other words, whatever the relation of the statutes, their purpose must be looked to to determine the application to them of section 162. So look to, we agree with the government that the purpose of the act of July 2, 1864, demonstrates the contrary of the contention of appellants, and that the act was strictly in addition to prior acts and not an amendment of the act of March 3, 1863 in the sense asserted. The latter act applied to a different situation." O'Pry v. United States, 1919, 249 U.S. 323, 329–330, 39 S.Ct. 305, 307, 63 L.Ed. 626. (Emphasis added.) Clearly, if the subsequent act applies to a similar, not to a different situation, it is amendatory.

for persons injured by violations of its antitrust policy".[9]

The legislative history of the Robinson-Patman Act is revealing although not entirely conclusive, on the point under discussion. The House Report stressed the penal feature of Section 15.[10] So did the statement of one of the conferees in submitting the Conference Report to the House.[11] At the same time, the proceedings in the Senate, when the Bill was accepted in its final form, indicate that the understanding was that Section 13a[12]—Section 3 of the Bill—in addition to creating a new criminal remedy, gave a civil remedy of treble damages also.[13]

A study of the three main statutes dealing with "monopolies and combinations",—the Sherman, Clayton and Robinson-Patman Acts—shows that they are closely interrelated. Starting with the Sherman Act[14], which merely condemned certain practices and their results, the Clayton Act[15] condemned the same practices in their inception.[16] Then came the Robinson-Patman Act, which brought under interdiction discriminatory practices, including discrimination through rebates, discounts and the like, denounced in Section 3 of the Act. They all aim to "suppress combinations to restrain competition and attempts to monopolize by individuals and corporations"[17] and maintain the freedom of commerce between the States.[18]

The goal is to protect "the interstate market". The Court of Appeals for the

9. United States v. National City Lines, 1948, 334 U.S. 573, 581, 68 S.Ct. 1169, 1174, 92 L.Ed. 1584.

10. House Report, No. 2951, 74th Congressional Session, June 8, 1936.

11. 80 Congressional Record, June 15, 1936. "There is no need to refer to the legislative history where the statutory language is clear." Ex parte Collett, 1949, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207.

12. 15 U.S.C.A. § 13a.

13. On the floor of the Senate, on June 18, 1936, the day the bill in its final form was accepted by the Senate, Senator Vandenberg had the occasion to discuss this very question with Senator Van Nuys, the co-author of Section 3 and one of the conference managers for the Senate. Senator Vandenberg stated that it was his understanding that treble damage actions could be brought pursuant to Section 3. Their colloquy follows (80 Congressional Record, 9903):

"Mr. Vandenberg: Mr. President, I should like to ask the Senator from Indiana one or two questions about the conference report.

"The fact has been called to my attention that Section 3 of the bill, as agreed upon in conference, makes certain discriminations punishable by fine and also subject to treble damages, while similar discriminations under Section 2(b) would be subject to rebuttal by showing, for instance, that a reduced price was made in good faith to meet an equally low price of a competitor. In other words, it is asserted to me that the defense allowed under Section 2(b) of the bill is not 'permitted under Section 3, although the act or the offense would be the same.'

"Mr. Van Nuys. I think the Senator is mistaken there. The proviso to which he refers is simply a rule of evidence rather than a part of substantive law. If a prima-facie case is made against an alleged unfair practice, the respondent may rebut the prima-facie case by showing that his lower prices were made in good faith to meet the prices of a competitor. That is a rule of evidence rather than substantive law." (Emphasis added.)

14. 15 U.S.C.A. §§ 1–7, 15 note.

15. 15 U.S.C.A. § 12 et seq.

16. United States v. Standard Oil Company, D.C.Cal.1948, 78 F.Supp. 850.

17. Parker v. Brown, 1943, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315. See, "The Tyranny of Labels"—A Study of Functional Discounts under the Robinson-Patman Act, 1947, 60 Harv.L.Rev. 571.

18. This chief aim of anti-trust law has been consistently stressed by the Supreme Court. See, Paramount-Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 42–44, 51 S.Ct. 42, 75 L.Ed. 145; Sugar Institute v. United States, 1936, 297 U.S. 553, 597–598, 56 S.Ct. 629, 80 L.Ed. 859; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 495–498, 60 S.Ct. 982, 84 L.Ed. 1311; Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 465–466, 61 S.Ct. 703, 85 L.Ed. 949; Associated Press v. United States, 1945, 326 U.S. 1, 12, 65 S.Ct. 1416, 89 L.Ed. 2013; Standard Oil Company v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

Eighth Circuit has stated the object of such protection: "The competitive freedom of such a market, in both buying and selling, is one of the principal things which the Sherman Act was intended to protect. Where that freedom is interfered with, by a contract, combination, or conspiracy, that from a public viewpoint harmfully restrains competition, or by an attempt, combination or conspiracy to monopolize, that has a direct wrongful purpose or other probable prejudicial consequences to the public interest, the force of the Sherman Act may be called into operation against it, on the basis of the public wrong involved, through the public or private remedies which the Sherman and Clayton Acts provide." [19]

In the attainment of this object, the private action for three-fold recovery of damages, while ancillary to the broad social object of the statute[20], is an integral part of the legislative scheme "intended in the most comprehensive way to provide against combinations or conspiracies in restraint of trade or commerce, the monopolization of trade or commerce, or attempts to monopolize the same. * * * In other words, founded upon broad conceptions of public policy, the prohibitions of the statute were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented, and hence not only the prohibitions of the statute, but the remedies which it provided were coextensive with such conceptions." [21]

In itself, this provision helps attain the object of the statute by supplying, as one writer has put it, "an ancillary force of private investigators to supplement the Department of Justice in law enforcement." [22] And, because the private remedy for treble damages is co-existent with the governmental remedies, the Supreme Court has given it a broad scope by permitting first municipalities [23], and then States [24], to institute such action as "persons" under the anti-trust acts.

## II. Civil Action Lies for Violation of Section 3 of the Robinson-Patman Act.

■ In view of the continuity of the policy evidenced by the history of anti-trust legislation to use the triple damage

19. White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 1942, 129 F.2d 600, 601, 604.

20. D. R. Wilder Mfg. Co. v. Corn Products Co., 1915, 236 U.S. 165, 173–174, 35 S.Ct. 398, 401, 59 L.Ed. 520; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 1934, 72 F.2d 885, 888–889; Maltz v. Sax, 7 Cir., 1943, 134 F.2d 2, 5.

21. D. R. Wilder Mfg. Co. v. Corn Products Co., 1915, 236 U.S. 165, 173, 35 S. Ct. 398, 401, 59 L.Ed. 520. And see, United States v. Cooper Corp., 1941, 312 U.S. 600, 608, 61 S.Ct. 742, 85 L. Ed. 1071. "The anti-trust laws are as much violated by the prevention of competition as by its destruction." United States v. Griffith, 1948, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236. See, Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236, 238.

22. Fifty Years of Sherman Act Enforcement, 1939, 49 Yale Law J., 284, 286. And see, Quemos Theatre Co. v. Warner Bros. Pictures, D.C.N.J.1940, 35 F. Supp. 949, 950; Weinberg v. Sinclair Refining Co., D.C.N.Y.1942, 48 F.Supp. 203, 205.

The author of the article referred to states that it was hoped that by the triple damage remedy "prospective monopolists would be harried by small competitors who were given the power to institute suit and exact penalties for violations of the Act." (Loc. cit.) Clearly, then, the over-all aim was to achieve the desired results of retaining freedom to trade as a characteristic element of our economy through the plenary power of the Congress to regulate interstate commerce. See, United States v. Colgate & Co., 1929, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992.

23. Chattanooga Foundry, etc. v. Atlanta, 1906, 203 U.S. 390, 391, 27 S.Ct. 65, 51 L.Ed. 241.

24. Georgia v. Evans, 1942, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346. And, in order that its inclusion of the States as beneficiaries be not considered unilateral, the Supreme Court later recognized them as possible violators of the law. Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315.

action as an adjunct of governmental enforcement, we should not, *absent a specifically expressed contrary legislative intent,* hold that the suits under Section 15 of Title 15 cannot be instituted for violation of Section 3 of the Robinson-Patman Act. It is, doubtless, true that the codifiers "were not empowered by Congress to amend existing law, and doubtless had no thought of doing so." [25] The Act of authorization declared that "nothing in this Act shall be construed as repealing or amending any such law, or as enacting as new law any matter contained in the Code." [26] And "as to that the command of Congress is too clear to be misread." [27] Nonetheless, unless we give to the word "amendment" a narrow meaning, which would exclude from the act every section which does not *in so many words say that it is amendatory of the Clayton Act,* it is sufficiently clear from the historical analysis which precedes that the Robinson-Patman Act, in its entirety, was amendatory of existing laws and that the codifiers, in replacing the enumeration of anti-trust laws in the Clayton Act by the more general provision now found in the Code[28], *which includes Sections 1–27 of Title 15,* had a sound understanding of the relation of the Robinson-Patman Act to preceding legislation and considered *all its provisions,* including Section 3,[29] as amendatory of the preceding Act.

The Court of Appeals for the Fourth Circuit has so stated: *"The Robinson-Patman Act of June 19, 1936, 49 Stat. 1526, was an amendment of the Clayton Anti-Trust Adt of Ocotber 15, 1914, 38 Stat. 730".*[30] (Emphasis added.)

Decisions from other Courts of Appeals which have had occasion to consider the various provisions of the Robinson-Patman Act and their relation to the prior legislation are in accord.[31] And several District Courts have held that the right to triple damages applies to violations of Section 3 of the Robinson-Patman Act.[32]

Judge Miller has expressed the interrelation between the various anti-trust statutes in this manner: "Those opinions discuss the history of anti-trust legislation; *they show that certain loopholes in the Sherman Anti-Trust Law were corrected by passage of the Clayton Act in 1914; and that certain difficulties which were found to still exist after the passage of that act were attempted to be remedied by the passage of the Robinson-Patman Act in 1936.* The scope of such legislation has accordingly been greatly enlarged over the period of years. It would be contrary to this evident purpose of Congress to take at the present time a narrow technical restricted view of the language used."[33] (Emphasis added.) As to the all-inclusiveness of the civil remedy, he writes: "If the act complained of is illegal the plaintiff is entitled to the civil remedy given by Section 4 of the Clayton Act, Title 15 U.S.C.A. § 15." [34] Judge Daw-

25. Warner v. Goltra, 1934, 293 U.S. 155, 161, 55 S.Ct. 46, 49, 79 L.Ed. 254.

26. 44 Stat., Part I, p. 1, 1 U.S.C.A. p. 4.

27. Warner v. Goltra, supra, 293 U.S. at page 161, 55 S.Ct. at page 49, 79 L.Ed. 254. The Code establishes "prima facie the laws of the United States". 1 U. S.C.A. § 204. Concededly it "cannot prevail over the Statutes at Large when the two are inconsistent." Stephan v. United States, 1943, 319 U.S. 423, 426, 63 S.Ct. 1135, 1137, 87 L.Ed. 1490.

28. 15 U.S.C.A. § 12.

29. 15 U.S.C.A. § 13a.

30. Oliver Bros., Inc., v. Federal Trade Commission, 4 Cir., 1939, 102 F.2d 763, 767. The statement was approved by the same Court in a later case, South-

gate Brokerage Co. v. Federal Trade Commission, 4 Cir., 1945, 150 F.2d 607, 609.

31. Biddle Purchasing Co. et al. v. Federal Trade Commission, 2 Cir., 1938, 96 F. 2d 687; Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 1939, 106 F.2d 667, 676–678. Webb-Crawford Co. v. Federal Trade Commission, 5 Cir., 1940, 109 F.2d 268.

32. See cases cited in Notes 33 to 35, infra.

33. Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co., D.C.1941, 37 F.Supp. 728, 735.

34. Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co., supra, 37 F. Supp. at page 735. A similar conclu-

kins in Atlanta Brick Co. v. O'Neal[35], *referring specifically to Section 3 of the Robinson-Patman Act,* says: "It does not provide in express terms that persons injured by things forbidden shall have a cause of action but by declaring them unlawful, the person so injured, I think, is entitled to invoke its provisions, if he can allege and prove injury proximately caused by such violations."

As specific is the language used by Judge Ford of the District of Massachusetts:[36] "However, Sec. 13a also makes it unlawful 'to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.' Plaintiff claims that the price of $1.75 at which defendant sold to the state was unreasonably low, for the purpose of eliminating plaintiff as a competitor. The complaint sets forth sufficient facts to show that plaintiff and defendant were competitors, since they were rivals for the business of selling lacquer to the State of New Hampshire. It describes the basic facts of an alleged course of conduct by defendant which might on further proof justify a finding that defendant acted for the purpose of eliminating plaintiff as a competitor. Nor can I hold, in the absence of further evidence, that the price of $1.75 was not unreasonably low. Consequently, I hold that on this point, the complaint properly alleges a violation of Sec. 13a".

Full recognition is thus given to the right to bring a civil action under Section 13a of Title 15 for practices which it declares illegal. Incidentally, in the case just referred to, the practices which formed the basis of the suit consisted of *underpricing* of the type for which recovery is sought in the cause of action under discussion here.

In sum, a comprehensive consideration of the history of the anti-trust monopoly legislation of the United States shows a consistent attempt to achieve maintenance of competition in our economy through the use of the power of the Congress to regulate commerce between the States. In the effort to attain this result, the Sherman, Clayton and Robinson-Patman Acts are successive steps. Following the initial act,—the Sherman Act,—the succeeding Acts were attempts, in the light of experience gained, to condemn practices which the preceding Act had not succeeded in reaching. The Clayton Act supplemented the Sherman Act (as its very title implied), and was directed "against competitive practices which did not assure fair play and therefore encouraged restraints of trade."[37] The Robinson-Patman Act represented "a further development of this emphasis upon business ethics as the essence of the monopoly problem".[38] The aim was the same and the various Acts but different steps in the direction of its attainment,—when experience showed the inadequacy of the original Act.

■ These considerations and the specific rulings of the Courts which have dealt with the problem are compelling reasons for holding that a right of action exists under Section 15 of Title 15 U.S.C.A., for violation of Section 13a as one of the "anti-trust laws" referred to in Section 12.

The motion to dismiss will be denied.[39]

sion was reached in Midland Oil Co. v. Sinclair Refining Co., 1941, D.C.Ill., 41 F.Supp. 436. A contrary view is taken by the writer of the note, The Robinson-Patman Act, 1936, 50 Harv.L.Rev., 106, 121–122.

35. 1942, D.C.Tex., 44 F.Supp. 39, 43.

36. A. J. Goodman & Sons, Inc. v. United Lacquer Mfg. Corp., 1949, D.C.Mass., 81 F.Supp. 890, 892.

37. Fifty Years of the Sherman Act Enforcement, 1939, 49 Yale Law J. 284, 301.

38. Ibid., op. cit., loc. cit. And see, John S. Crider, A Brief History of the Growth of Anti-Trust Legislation in the United States, 1934, 7 So.Cal. Law Rev. pp. 144 et seq.; Note, "Preservation of Competition Through Federal Antitrust Laws", 1938, 51 Harv.L.Rev. pp. 694 et seq.

39. Since the foregoing opinion was filed, the Supreme Court, on January 8, 1951, decided the case of Standard Oil Company v. Federal Trade Commission, 71 S.Ct. 240. Both the majority and the minortiy opinion seem to me to envisage

the whole Robinson-Patman Act as amendatory of the Clayton Act.

Mr. Justice Burton, in the majority opinion, speaking of certain testimony that would have been admissible under the phrase: "the Clayton Act, uses the phrase: "the Clayton Act, before its amendment by the Robinson-Patman Act". Again he refers to "the amendments made by the Robinson-Patman Act".

The dissenting opinion of Mr. Justice Reed, in like manner, speaks of "the amendments of the Robinson-Patman Act".

So, while the Court in that case was dealing with the amendment to Section 2 of the Clayton Act, I feel that the thought that the Robinson-Patman Act in its entirety was amendatory of the Clayton Act finds support in these opinions.