**BALIAN ICE CREAM CO., Inc. et al. v. ARDEN FARMS CO. et al.**

**No. 12434.**

United States District Court
S. D. California, Central Division.
April 29, 1952.

798

Sheppard, Mullin, Richter & Balthis, Gordon F. Hampton, and Richard B. Hoegh, all of Los Angeles, Cal., for plaintiffs.

Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether, Jesse R. O'Malley, Gibson, Dunn & Crutcher, Henry F. Prince, Esq., and Julian O. von Kalinowski, all of Los Angeles, Cal., for defendants.

YANKWICH, Chief Judge.

Before me are fifteen actions brought by various plaintiffs, ice cream manufacturers, against a group of defendants. Originally the complaints were directed against certain corporate and individual defendants,—who were the officers and directors of the corporations. At the conclusion of the plaintiffs' case the court dismissed the cases as to the individual defendants. The cases then proceeded against nine corporation defendants, all of which are wholly-owned subsidiaries of Arden Farms Co., a corporation. The litigation has been the subject of two prior opinions by the writer.[1] In these opinions, the chief facts underlaying

4. Balian Ice Cream Co., Inc., v. Arden Farms Co., D.C.Cal.1950, 94 F.Supp. 796; F. & A. Ice Cream Co. v. Arden Farms Co., D.C.Cal.1951, 98 F.Supp. 180.

the cases are given. The proof at the trial narrowed the issue to one single act of the defendants on which the claims under the various federal and state statutes were based,—namely, the drastic reduction by the defendants of the wholesale price of ice cream in the Los Angeles area on November 21, 1949.

The reduction was to $1.06 per gallon for the wholesale base price of "Flavor Fresh" ice cream from $1.44 per gallon. The reduction did not apply to other states in which it was alleged these products were sold, such as Arizona, Oregon, Washington, Idaho and Montana. Other monopolistic practices were alleged in the complaint in this and the other cases,—such as misuse of patented products, unlawful discounts and the like. They need not concern us, as the entire case was built around the price reduction. On it, in the cause in which this opinion is written, were based seven claims or causes of action.

The first is based on Section 1 of the Sherman Anti-Trust Act,[2] and alleges that the defendants combined to monopolize trade by selling and distributing ice cream in the Los Angeles area at reduced prices for the purpose of eliminating competition.

A second cause of action under Section 2 of the Sherman Act [3] charges an attempt to monopolize trade and inter-state commerce by selling ice cream in Los Angeles at prices lower than sold in places in the adjoining states already mentioned.

A third cause of action restates the same facts as a violation of Section 3 of the Clayton Act [4] by exclusive requirement agreements aimed at lessening competition.

Another cause of action is grounded on Section 1 of the Robinson-Patman Price Discrimination Act.[5] It alleges discrimina-tion in price between customers in the Los Angeles area and those in the localities above mentioned. Another cause of action is under Section 3 of the Robinson-Patman Price Discrimination Act and charges the sale of ice cream at unreasonably low prices.[6]

A final cause of action is based on the California Cartwright Act.[7] It charges a combination (a) to create and carry out restrictions in trade and commerce (b) to reduce the price of ice cream, and (c) to prevent competition in ice cream and kindred products.

Damages are asked in the present case in the sum of $72,934.35 with demand to treble the amount as to the causes of action arising under the Sherman, Clayton and Robinson-Patman Acts and to double it under the State Act.

## I

### Some of the Legal Problems Involved

■ These actions are unique in that they concern acts not between a group of corporations which are strangers to one another but acts of a parent corporation and its subsidiaries wholly owned and controlled by it. They are maintainable only because the Supreme Court in some very recent cases has held that a corporation· dealing with its subsidiaries may be guilty of violations of the anti-trust statutes.[8·]

■ The philosophy behind the Anti-Trust Laws has been discussed in detail· by the writer in the prior opinions in these· cases. Their aim is:

"to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations".[9]

In this manner they seek to maintain the freedom of commerce between the States.[10·]

---

2. 15 U.S.C.A. § 1.

3. 15 U.S.C.A. § 2.

4. 15 U.S.C.A. § 14.

5. 15 U.S.C.A. § 13.

6. 15 U.S.C.A. § 13a. This cause of action is fully described in the writer's opinion in F. & A. Ice Cream Co. v. Arden Farms Co., supra.

7. California Business and Professions Code, Secs. 16700–16758.

8. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219; Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 598–599, 71 S.Ct. 971, 95 L.Ed. 1199.

9. Parker v. Brown, 1943, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315.

10. See cases cited in Notes 18 to 21,. Balian Ice Cream Co., Ine., v. Arden· Farms Co., supra.

The Sherman Act condemns certain practices and their results. The Clayton Act seeks to reach contracts aiming at the result. The Robinson-Patman Act prohibits certain specific discriminatory practices. Price discrimination, which seeks to restrain trade or commerce, or attempts to eliminate competition, is a violation of the Sherman Act,[11] and contracts aiming to achieve this result do violence to the Clayton Act.[12] Concededly, price discrimination, predatory in nature, is an accepted method of destroying competitors.[13]

■ Price discrimination is also condemned by Section 1 of the Robinson-Patman Act, except when made in good faith to meet a competitor's low prices, as provided in Section 2(b) of the Act.[14] And sales made at unreasonably low prices are distinctly forbidden by Section 3 of the Robinson-Patman Act,[15] when made for the purpose of destroying competition or eliminating a competitor. As stated in one of the prior opinions,[16] two conditions must concur before prices may be condemned under this section of the Act: (a) the prices must be found to be unreasonably low, and (b) they must be found to have been established with the design and purpose to destroy competition.

The California Cartwright Act specifically prohibits restrictions in trade and commerce.[17] Without considering now whether the statute, as it now reads, prohibits reduction as well as increase of prices of merchandise,[18] we may assume that whatever constitutes a violation of the Sherman and Clayton Acts, if done by a person engaged in inter-state commerce, in the course of such commerce, would be a violation of the state law, if done in local commerce. As we are dealing with a single act,—the price reduction put into effect on November 21, 1949,—the problem, in the last analysis, reduces itself to what I stated it to be towards the conclusion of the argument: Was the price reduction justified by business and economic considerations of the type which would govern reasonable persons, confronted with diminishing sales in an endeavor to keep their customers or gain others?

## II

### The Meaning of Competition

■ The answer to this question requires us to consider the problem of competition and what it entails. When we do this, we must bear in mind that the aim of all anti-trust statutes, from their very

---

11. Standard Oil Company v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. All price fixing is illegal. United States v. Trenton Potteries Company, 1927, 273 U.S. 392, 396–400, 47 S.Ct. 377, 71 L.Ed. 700; United States v. Socony-Vacuum Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Masonite Corporation, 1942, 316 U.S. 265, 274, 62 S.Ct. 1070, 86 L.Ed. 1461; Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 386, 71 S.Ct. 745, 95 L.Ed. 1035.

12. Porto Rican American Tobacco Co. v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234; E. B. Muller & Co. v. Federal Trade Commission, 6 Cir., 1944, 142 F.2d 511; Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540. The Clayton Act does not compel a one-price policy.

"But the Clayton Act, 38 Stat. 730, singled out two practices for special treatment, price discrimination and exclusive dealing and other tying agreements. Section 2 forbids discriminations in price not based upon differences in grade, quality, quantity, or cost of transportation which substantially lessen competition or tend to create a monopoly in any line of commerce. The section outlaws unfair discriminations which substantially lessen competition or lead to monopoly. *It does not compel a one-price sales policy.* It does not forbid sales below cost in the absence of discrimination." Biddle Purchasing Co. v. Federal Trade Commission, 2 Cir., 1938, 96 F.2d 687, 690. (Emphasis added.)

13. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 436–437.

14. 15 U.S.C.A. § 13(a) and (b).

15. 15 U.S.C.A. § 13a.

16. F. & A. Ice Cream Co. v. Arden Farms Co., supra, 98 F.Supp. at page 189.

17. California Business and Professions Code, Sec. 16720(a).

18. California Business and Professions Code, Sec. 16720(b).

inception, and the aim of the state statutes which have followed them, was to prevent monopoly by fostering competition. Too often, at the present time, especially in actions instituted by individuals to recover treble damages, the contrary aim of the various state "Fair Trade" Acts is attempted to be injected into anti-trust litigation. It has no place there. For, as a recent writer has stated, the object of the States and of some of the Federal Regulatory Commissions, such as the Federal Trade Commission, seems to be to establish a "soft" competition,—*a competition that does not hurt much.*[19]

The House Committee on the Judiciary, in one of its recent reports, has given the answer to this contention:

> "In any competitive economy we cannot avoid injury to some of the competitors. *The law does not, and under the free enterprise system it cannot, guarantee businessmen against loss.* That businessmen lose money or *even go bankrupt does not necessarily mean that competition has been injured* * * * We cannot *guarantee competitors against all injury.* This can only be accomplished by *prohibiting competition.*"[20] (Emphasis added.)

It is of the essence of competition that it must, of necessity, injure others. For, as a three-judge court once wrote:

> "Competition is, in its very essence, a contest for trade".[21]

In such contest, differences in (a) the quality of goods offered, and (b) their prices are accepted means of competition. Reputable concerns constantly advertise, "We will not be knowingly undersold." And no case exists in which the courts have held that a price reduction, in itself, not having as its purpose the destruction of a competitor or the monopolization of trade or commerce, but made to meet competition in the field or to retain trade or custom or to gain new custom, is *illegal as such.*

The writer already quoted has summed up the problem as it relates to the Robinson-Patman Act in a manner which may well be applied to price reduction envisaged under any of the acts under consideration:

> "The right of a seller to lower his price in good faith to meet the equally low price of a competitor in the sale of goods of like grade and quality is, *in reality, the right to compete.* For to deny a seller the right to meet his competitor's lower price to his customer is in effect to deny him the right to compete with that competitor. A 1941 report of the Federal Trade Commission, to a Congressional Committee, is in part:
>
> "'*The right of self defense against competitive price attacks is as vital in a competitive economy as the right of self defense against personal attack.*'"[22] (Emphasis added.)

19. Wm. Simon, Price Discrimination to Meet Competition, The University of Illinois Law Forum, Vol. 1950, No. 4, p. 575, 581.

20. H.R.Rep.No.1422, 81st Cong., 1st Sess. 5, 6 (1949).

21. United States v. Standard Oil Co. of New Jersey, D.C.E.D.Mo.1931, 47 F.2d 288, 297. The entire passage is worth quoting as it emphasizes the fact that loss to some is implicit in, and of the essence of, a competitive economy.

    "Competition is the antithesis of monopoly. In a sense, any elimination of competition is a movement in the general direction of monopoly. But competition is, in its very essence, a contest for trade, and any progress or victory in such contest must lessen competition. *Competition must always bear in itself the seed of its own alteration or even destruction. Success in business is ordinarily success in competition, and such success is a usual incentive to business effort, and is, of itself, commendable.* It is only when this lessening is with an unlawful purpose or by unlawful means, or when it proceeds to the point where it is or is threatening to become a menace to the public, that it is declared unlawful." United States v. Standard Oil Co. of New Jersey, supra, 47 F.2d at page 297. (Emphasis added.)

22. Wm. Simon, Price Discrimination to Meet Competition, The University of Illinois Law Forum, Vol. 1950, No. 4, p. 575, 576–577.

We are fortunate in having a very recent decision of the Supreme Court which, in interpreting the meaning of the good faith clause in Section 2(b) of the Robinson-Patman Act,[23] insists, against the contrary contention of the Federal Trade Commission, that if good faith exists in establishing a price reduction, it matters not *how much a competitor is hurt.*[24] In holding that a price differential made in good faith to meet a lawful and equally low price of a competitor is a complete defense to a charge of price discrimination, Mr. Justice Burton, writing for the majority of the court, insists that, without the right to reduce prices to meet competition, competition itself would disappear.

We quote this rather lengthy passage in full because it is a complete answer to some of the arguments which have been advanced in this case:

"The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act, 'Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.' A. E. Staley Mfg. Co. v. Federal Trade Comm., 7 Cir., 135 F.2d 453, 455. We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts. It is enough to say that Congress did not seek by the *Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor.* For example, if a large customer requests his seller to meet a temptingly lower price offered to him by one of his seller's competitors, the seller may well find it essential, as a matter of business survival, to meet that price rather than to lose the customer. *It might be that this customer is the seller's only available market for the major portion of the seller's product, and that the loss of this customer would result in forcing a much higher unit cost and higher sales price upon the seller's other customers.* There is nothing to show a congressional purpose, in such a situation, to compel the seller to choose only between ruinously cutting its prices to all its customers to match the price offered to one, or refusing to meet the competition and then ruinously raising its prices to its remaining customers to cover increased unit costs." (Emphasis added.)[25]

It is implicit in the language just quoted that in reducing his price to meet competition, the seller has a choice of policy. (a) If it involves a particular customer, he may, in an endeavor to keep him, underbid the price. (b) If it involves several customers in an area, he may reduce the price to his customers within the area. (c) If he is confronted, as were the defendants in this case, by various competitors, each of whom in his own way, offered what are euphemistically known in the trade as "inducements",—by which are meant gratuities, rebates in kind, and other "deviations" from listed prices, to the same or to different customers,—he is justified in taking what the Supreme Court, in the case just cited, considered an extreme measure, i. e., to reduce his prices in the whole locality. In this manner, a price set-up full of discrimination, which his competitors seek to freeze, is turned into a general reduction. Equality thus succeeds discrimination.

I know of no principle of law which condemns such act. To the contrary, reason and good sense warrant the conclusion that such course is sound legally, as well as economically. Otherwise, under the guise of fighting monopolistic practices, we would be sanctioning them by perpetuating partial discrimination.

23. 15 U.S.C.A. § 13(b).

24. Standard Oil Company v. Federal Trade Commission, 1951, 340 U.S. 231, 246, 71 S.Ct. 240, 95 L.Ed. 239.

25. Standard Oil Company v. Federal Trade Commission, supra, 340 U.S. at page 249, 71 S.Ct. at page 248.

## III

### The Price Reduction

The views just expressed call for an outline of the facts in the case. Significantly, in this case, unlike other cases, the plaintiffs did not rely on anyone who "sat in" when the conspiracy "was born". They relied only on certain admissions made by officers of the defendants and statements contained in office memoranda and correspondence between the various officers and the corporations. The only statements which are alleged to be indicative of any design are weak indeed.

Guy C. Primmer, President of one of the plaintiff companies, and a former employee of Arden, reported the following conversation with J. Frank Holt, Treasurer of Arden of Delaware, immediately following the price cut:

"Q. Will you tell us what you said and what Mr. Holt said? A. Well, I said, 'Frank, now look. I know and you know, we know how big Arden is, and how far-spread it is, and what the effect of this price cut means on the market. What is the purpose in this?

"Q. What did Mr. Holt say? A. Well, Frank says, 'Guy *we are going to take all the profit out of ice cream.*'

"Q. And did you reply to that? A. Yes, I did. I said, 'Well, Frank, you fellows have got milk, you have got butter and eggs, and your market activities.' I said 'I am just in the ice cream business.' And I said, 'Good Lord, *those prices are going to ruin us independent business men.*'

"Q. Did Mr. Holt reply to that? A. Well, he said, '*I'm sorry, Guy,' and shrugged.*" (Emphasis added.)

Primmer had a similar conversation with C. H. Weaver, an employee, but not an officer of Arden:

"The Witness: We were having a general discussion about our scores, and one thing and another, and the subject of the price cut the day before came up. And I said, 'Buck' * * * everybody calls him Buck * * * I said, 'Buck, what is your company trying to do? Ruin us fellows? And he said, 'Well, Guy, *we've got $8,000,-000.00 to spend and some of you fellows are going to get hurt.*'

"Q. By Mr. Hampton: Now, Mr. Primmer, did you have further conversation with Mr. Weaver? A. Well, after that I changed it to something more pleasant, I mean." (Emphasis added.)

These statements have little significance. They are consistent with good faith. They were indicative that the speaker thought that the company was strong enough to stand the cut. *As indeed it was.*

The only real sequential narration of motivation comes to us from the men who were responsible for the price cut and the contemporaneous memorials of their actions.

### A

### The Facts Behind the Action

The pattern which the testimony of the officers of the defendants discloses is almost identical.

In what follows, we give a summary (modified by references to Exhibits) as it appears from the testimony of John A. Tongue, who, when the price cut was put into effect, was the Treasurer of Arden of Delaware, and one of its vice-presidents. He was in charge of ice-cream operations, and particularly of the plant at Twenty-first Street in Los Angeles, and was a member of the Operating Committee which discussed operations, and was instrumental in putting into effect the price cut. Of the several corporations, only four actually engaged in manufacture and distribution of ice-cream, Arden Farms Co., an Arizona corporation, the Frigid Process Company, Inc., with a plant at Pasadena, the Ritz Ice Cream Corporation, and Arden Farms Co., a Delaware Corporation, to be referred to as Arden.

The price reduction was admittedly put into effect on November 21, 1949, by the two distributing defendants, Arden and Frigid. As one in charge of ice-cream operations, Tongue was very familiar with what went on in the field. He had been in the ice-cream business since 1919. For a

long time prior to 1949, the ice-cream business in the Los Angeles area had been very competitive. Every ice-cream company, large or small, was a competitor of Arden. This included all the plaintiffs, in addition to larger concerns like Carnation, Challenge, Golden State, Mountain View, Meadow Gold, Swift. Companies which did business locally were not affected by a price offer in a small area. But, because Arden was competing in the whole area, they were affected by every local change. As the witness explained:

> "One small company in Santa Monica might not be troubled with another competing ice-cream company in Long Beach, but Arden, being in both areas, would be affected by this type of competition."

They would have to establish selling conditions. These related not only to prices, but also to quality of package and article, and selling policy in all areas that would enable them to compete in the area. At times they found it best to drop down locally to meet a local competitor's situation. At others they could not do so because they would have to maintain fairly well uniform competitive conditions all over. In addition to this, there were "captive creameries",—creameries owned by large grocery chains or distributors which manufactured ice cream solely for them. The principal of these are Ralphs', which serves the Ralphs Grocery stores; Lucerne Creamery and Butter Association, which serves the Safeway Grocery chain; the District Ice-Cream Company, which serves its products to the Owl-Rexall and Whelan Drug chains; Jersey Maid, a cooperative company owned by a number of market operators,—the Market Basket chain, the Fitzsimmons chain, the Thriftymart and Roberts Markets, Von's Markets, Carty Bros. chain, and the Alexander Market; Golden Creme, an operation of similar nature, owned by a group of thirty-two market owners who operate seventy-three stores and buy their ice cream and milk products from Golden Creme.

In 1946 and 1947, there came into being a product known as the "Foster Freeze", an ice-milk product, which spread rapidly through the establishment of stores where soft ice-milk was sold. Similar stores had existed before. But the Foster product seemed to have given impetus to their growth.

The factors in these developments were constantly under discussion by the Operating Committee. Efforts were being made to meet the competitive condition by bringing out new items, increasing the advertising and merchandising campaigns and "instilling more life" into their sales organization. Arden brought out "Flavor Fresh" ice cream in both bulk and package quality and cartons, and "Diced Cream",—a patented product, with great "enthusiasm and flourish". But the loss of customers continued, and expressed itself both in number of customers and in gallonage.

A chart introduced in evidence is very revealing in this respect.

As of 1946, the percentage of ice-cream products of Arden and subsidiaries in gallons sold was 23 per cent of the total sold in the counties of Los Angeles, Orange, Riverside, San Bernardino, Santa Barbara and Ventura. In 1947, the percentage was 22; in 1948, it was 20; in 1949, it was 18; and in 1950, it was 17. In gallonage, the drop was from seven million gallons in 1946, to a little over four million gallons in 1949. During the same period, the gallonage sold by the plaintiffs remained almost constant. It was 11 per cent in 1946, 11 per cent in 1947, 13 per cent in 1948, 13 per cent in 1949, and 13 per cent in 1950.

Arden's competitors made frequent changes in price. The representative of one of the larger concerns testified to at least eighteen instances of deviations from listed prices during a certain period in 1949. The gallonage affected was not disclosed. Many other similar deviations were made by other concerns, large and small.

To the writer, it is apparent that what we are confronted with is an industry in which, when it came to price, the published "price lists" were meaningless because each of them was subject to so-called "inducements", i. e., variations in price, which affected certain types of business, and rebates, direct and indirect. Even the State law of California, which forbade the giving

to distributors of rent-free cabinets, was circumvented by allowing the rentals to accumulate. So long as the account was maintained, there was never a cancellation for failure to pay the rentals.

It was very revealing how each of the plaintiffs and those from other competitive companies which appeared, rationalized his own deviation. At the same time, they expected that, except in these particular deviations, the price would be frozen. In this respect, the case is an unusual one. *What we are, in reality, asked to do, under the guise of encouraging competition, is to freeze a certain pattern of price discrimination until the others in the industry get ready to make it more universal.*

The answer is that, as Arden covered the entire field, the problem, so far as they are concerned, must be approached from that angle. And the plaintiffs and other competitors of Arden cannot be heard to say that, although they made bids to public bodies and others below the minimum price established by Arden on its ice-cream products before November 21, 1949, on November 21st Arden was limited in its attempt to meet competition to reductions only within the narrow field established by them.

For truth is, you cannot segmentize a market. This is especially true as to a concern which blankets a large geographical area. As to it, the reasonableness of of the price cut must be determined by the impact which these individual price cuttings by the plaintiffs themselves and other competitors had on Arden's custom, its desire to keep its old customers and gain new ones.

So, in 1948, when the new products did not seem to improve the condition, other measures began to be considered. One of the leading companies in the territory reduced its price ten cents in one month, and five cents in the following month,—which put it down to where it was in actual price list, around twenty-four cents a gallon below Arden's price. Arden then began to be very critically concerned with the situation in the latter part of December of 1948 and the first two months of 1949. The members of the Operating Committee agreed that the price lists in the industry were fallacious, unrealistic and that the only way to meet the situation was to reassay the price structure, make a reduction in the ice-cream price that would meet the situation, and that if any diminution of business resulted, to make it up by curtailing costs. Advertising was cut by several hundred thousand dollars. Sales persons were laid off, and many other economies put into effect coincidental with the price cut.

The prices were actually put into effect on November 21, 1949. However, the new price list was completed on the 19th. There probably was some "leak" about it. For some of the competitors, including Challenge, made reductions as of that date. These, in the main, were the considerations which led to the change. The business of Arden in the ice-cream market, at its best, even in 1946, when they produced twenty-three per cent of the gallonage, was such that even if it had gained the entire custom of the plaintiffs,—eleven per cent,—it still would not have gained the control of the market. As of 1950, when presumably the "monopolistic" effects would have been noticeable, Arden's volume was down to seventeen per cent, to which, if all the thirteen per cent of business of the plaintiff had been added, there would have been a gallonage of thirty per cent,—only seven per cent above its maximum of 1946. As it is, all but one of the plaintiffs are still in business, and, as the record shows, their gallonage is the same as it has been for the last three years. The one plaintiff no longer in the business had a forced liquidation and sale to a competitor for reasons not connected with the price reduction.

B

The Contemporaneous Memorials

In a case of this character, the trier of facts is helped greatly by memorials of actions long preceding the act in dispute. Made, as they are, in the regular course of business before any controversy arises, such memorials are more eloquent than later protestations. In the Minutes of the Operating Committee, which was responsible for the recommendation to the company to make the cut in price, we find many references to the conditions to which Tongue

and other officers of Arden testified. Thus, on January 3, 1949, and on January 24, 1949, the Minutes reflect the fact that the cash situation of the company was not so good as it had been the year before. On January 24, 1949, there is a warning by Holt

"that it looks as if 1949 is going to be a pretty tough year, and it will be necessary *to treat a dollar with greater respect* than we have at any time during the past decade." (Emphasis added.)

On January 31st, we find a statement by Tongue to this effect:

"Ice-cream prices are *being reduced* by some of our competitors. *Challenge reduced their price 10¢ per gallon about 6 weeks ago and last Saturday, reduced prices another 5¢ which makes a total reduction of 15¢ per gallon. Prior to these reductions, their price was approximately 9¢ lower than ours which now puts them about 24¢ below us.* Stated the ice-cream business is becoming more competitive each day." (Emphasis added.)

On March 28, 1949, we find the statement of Samuel H. Berch, now deceased, who occupied the position now occupied by Tongue:

"We all know of the great inroads made *in the ice-cream business by Foster Freeze stores.* Stated he had been looking into the Softee machine and has used it on Diced Cream and it turns out a very outstanding product. He felt that if we can secure this machine, or a similar one, it would put our dealers in a position to compete with the soft ice cream now being sold by Foster and other stores. It was agreed Mr. Tongue should make every effort to arrange a meeting between Mr. Berch and the Softee representatives." (Emphasis added.)

Similar reports as to the competitive situation throughout California were made, and that "ice cream selling prices were getting weaker and competition situation is very serious," at each of the meetings on June 13, June 27, and July 25, and reports of losses of customers through price reduc-

tions by others were given. Significantly, on June 13th, there was reported the loss of a Drive-In located at Fresno, California, which purchased 12,000 gallons per year. The account went to a competitor at ninety-five cents per gallon whereas Arden received $1.23 per gallon. They also lost two large drugstores in San Diego representing 15,000 gallons per year.

Without more details, the Minutes tell the same tale which the reports to the members of the Committee from the men in the field had told before. And these also appear in the Minutes of October 17 and, November 14, 1949,—the Minutes of the last meetings before the price cut was put into effect. On November 14, the decision was reached. The Minutes gave this summary of conditions:

"It was pointed out that we have discussed this subject many times at our meetings and it appears that low selling prices of certain distributors have reached the point where immediate action should be taken. During the past week, discussions, including Messrs. Berch, Holt, Tongue, Williams, and Lewis, were held and it was the opinion *that there is only one way to remedy this situation and that is to prepare a new ice-cream selling schedule with lower prices in order to compete with present conditions. This will require elimination of all unnecessary expense and personnel; reorganization of our sales department and manufacturing department; and simplification of our line in order to bring all items of expense to a minimum."* (Emphasis added.)

It will be noted that Arden expected that the lowering of the price would require elimination of unnecessary expense, reduction of personnel, reorganization of sales and manufacturing departments and simplification of the line in order to bring all items of expense to a minimum. The hope to achieve the result was nurtured by the fact that the price costs for Arden involving the main items of expense,—butter fat, man-hour cost, serum solids,—began declining in 1949, and continued to decline until the middle of May, 1950. A parallel

chart shows a similar decline in the average selling price of all Arden's products for the same period.

So we come back to the question originally propounded:

When a business concern is confronted with a set of economic conditions prevailing in a market, and, after long and mature consideration, decides upon a policy of price reduction, which, in its effect, was not so drastic as some of its competitors had offered in particular instances, should it be penalized because it decided to solve the problem by *giving to all its customers the benefit of prices which its competitors had given to special customers only?*

The answer is obvious. In an industry shot through with favoritism, euphemistically called "inducements", is a concern compelled to participate in the freezing of a partial discrimination when it affects its entire business under penalty of damages? There is no principle of law or polity that requires the Court to make itself the instrument of so grave an injustice. To repeat,—the object of the anti-trust law is to encourage competition. Lawful price differentiation is a legitimate means for achieving the result. It becomes illegal only when it is tainted by the purpose of unreasonably restraining trade or commerce or attempting to destroy competition or a competitor, thus substantially lessening competition, or when it is so unreasonable as to be condemned as a means of competition. The price reduction here has none of these stigmata. And if the tests of reasonableness, which the writer laid down in one of the prior opinions, be applied[26], it is apparent that the price reduction here was

(a) long in contemplation; (b) it bore a realistic relation to previous changes by others in the field, either in the locality or elsewhere; (c) it corresponded to factors relating to cost of production and demand for the article and the continuous shrinkage of Arden's custom,—all of which, after long and mature consideration, called for the reduction. These are legitimate criteria for legal price reduction.[27]

## IV

### Some Incidental Problems

Some incidental problems remain to be considered.

### A

#### Interstate Commerce Involved

The first is whether the facts in the case indicate that the reduction in price affected interstate commerce or was "in the course of commerce." While the volume of interstate commerce involved is not impressive, I believe that the price reduction was of a nature to affect interstate commerce, whether the matter be considered under the Sherman and Clayton Acts or under the Robinson-Patman Act, i. e., "engaged in commerce", and/or "in the course of commerce."

As the plaintiffs are not engaged in interstate commerce, the effect of any price reduction, as to them would be local only. But the price reduction would burden interstate commerce by maintaining higher prices for ice cream in out-of-state areas in which Arden's products were sold.

There is some evidence of such sales across state lines. There is also evidence of interstate shipments of equipment and

26. F. & A. Ice Cream Co. v. Arden Farms Co., D.C.Cal.1951, 98 F.Supp. 180, 190.

27. Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 367, 369. See, M. A. Adelman, Effective Competition and the Anti-Trust Laws, 1948, 61 Harv.Law Rev., pp. 1289, 1331; M. A. Adelman, Integration and Anti-Trust Policy, 1949, 63 Harv.Law Rev., pp. 27, 39–41; Note, Proof of Cost Differentiation Under the Robinson-Patman Act, 1952, 65 Harv. Law Rev. p. 1011.

"But *price cutting without more is not a violation of the Sherman Act. It*

*is indeed a competitive practice which this record shows to have been common in the industry. It may be used in violation of the Act.* Thus it may be the instrument of monopoly power to eliminate competitors or to bring them to their knees. But since it is not unlawful *per se*, facts and circumstances must be adduced to show that it was in purpose or effect employed as an instrument of monopoly power." Schine Chain Theatres, Inc. v. United States, 1948, 334 U.S. 110, 120–121, 68 S.Ct. 947, 953, 92 L.Ed. 1245. (Emphasis added.)

products to agents, affiliates and subsidiaries. These are sufficient to satisfy the minimal requirements of the Sherman, Clayton and Robinson-Patman Acts.[28]

## B

### The Cartwright Act

In view of the conclusion reached, it is really unnecessary to determine whether the Cartwright Act[29] condemns "reduction of price".[30] Nor is it necessary to determine whether, because some of the defendants are of the same citizenship as the plaintiffs, true diversity of citizenship exists as to the cause of action based on the Cartwright Act, so as to give this court jurisdiction of it.[31]

But giving to the plaintiffs the benefit of favorable assumptions as to both matters, the argument which precedes indicates that the price reduction here involved was a valid exercise of business judgment in a competitive field, and would not constitute a violation of the State Act.

If the plaintiffs suffered any injury, it is that which flows naturally and irrevocably from competition.[32] This is not actionable under any of the Federal and State statutes involved.

Judgment will, therefore, be for the defendants.

---

28. Standard Sanitary Manufacturing Company v. United States, 1912, 226 U.S. 20, 50–51, 33 S.Ct. 9, 57 L.Ed. 107; Local 167, International Brotherhood of Teamsters v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804; C. E. Stevens Co. v. Foster & Kleiser Co., 1940, 311 U.S. 255, 260–261, 61 S.Ct. 210, 85 L.Ed. 173; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010; United States v. Griffith, 1948, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236; Lorain Journal v. United States, 1951, 342 U.S. 143, 151–152, 72 S.Ct. 181; Porto Rican American Tobacco Co. v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234, 236.

Indicative of the limited interstate activity which suffices under the Sherman Act is the following summary of facts as to one of the defendants involved in Standard Sanitary Manufacturing Company v. United States, supra, 226 U.S. at pages 50–51, 33 S.Ct. at page 15:

"It appears from the testimony that the company was a manufacturer and a jobber, manufacturing about one half of what it sold. As a jobber it bought goods from other manufacturers, but it denies there was an agreement as to prices with such manufacturers.

"The testimony as to the state or interstate character of its business is that it manufactures at Elizabeth, New Jersey, and buys also from other manufacturers and jobbers. *It ships from there to its warehouses in New York, Worcester, Massachusetts, and Brooklyn. The trade of its Worcester branch covers about 200 miles around Worcester, its efforts being to localize its business. It is doubtful, it is testified, if the trade goes beyond Massachusetts, the trade* there *being circumscribed. Sales in Connecticut are made through the New York office from the ware-rooms.*

"It is manifest that the Colwell Company was a party to the combination and *was also engaged in interstate commerce.* The fact that its trade was less general than that of the other manufacturers and jobbers does not take from it the character of an interstate trader." (Emphasis added.)

29. California Business and Professions Code, Sec. 16701.

30. I am of the view that the 1909 Amendment effectively eliminated these words. See, Speegle v. Board of Fire Underwriters, 1946, 29 Cal.2d 34, 48, 172 P.2d 867.

31. 28 U.S.C.A. § 1332.
    "*District Courts have jurisdiction if all the parties on the one side are of citizenship diverse to those on the other side.*" (Emphasis added.) Salem Trust Company v. Manufacturers' Finance Company, 1924, 264 U.S. 182, 189, 44 S.Ct. 266, 267, 68 L.Ed. 628. Jurisdiction does not exist if *one* of the plaintiffs and *a defendant corporation* are citizens of the same state. Mitchell v. Maurer, 1934, 293 U.S. 237, 242, 55 S.Ct. 162, 79 L.Ed. 338; Mathers & Mathers v. Urschel, 1935, 10 Cir., 74 F.2d 591, 592–593. All the remaining defendants, other than Arden, Diced Cream of America Co. and A–1 Ice Cream Co., are California corporations. The plaintiffs are either California corporations or individual residents of California.

32. See, Bruce's Juices, Inc., v. American Can Co., 1947, 330 U.S. 743, 750–752, 67 S.Ct. 1015, 91 L.Ed. 1219.